Joan B. **HAGENBUCH**

v.

**SNAP–ON TOOLS CORP.**, Fairmount
Tool and Forging, Division of
Houdaille Industries, Inc.

Richard P. **HAGENBUCH**

v.

**SNAP–ON TOOLS CORP.**, Fairmount
Tool and Forging, Division of
Houdaille Industries, Inc.

Civ. A. Nos. 3150, 3151.

United States District Court,
D. New Hampshire.

March 2, 1972.

E. Donald Dufresne and Stephen J. Spielman, Devine, Millimet, McDonough, Stahl & Branch, Manchester, N. H., for plaintiffs.

Charles J. Dunn, Wadleigh, Starr, Peters, Dunn & Kohls, Manchester, N. H., for defendants.

## OPINION

BOWNES, District Judge.

Plaintiff Richard P. Hagenbuch brings this action for damages for personal injuries resulting from a hammer chip striking him in the left eye. He alleges breach of implied and express warranties, negligence, and strict liability in tort. His wife, Joan Hagenbuch, seeks damages for loss of consortium. Defendant Snap-On Tools Corporation was the seller of the hammer, and defendant Houdaille Industries, Inc. through its subsidiary, Fairmount, was the manufacturer of the hammer which the plaintiff was using at the time of the injury. Jurisdiction is based on diversity of citizenship and damages in excess of $10,000. 28 U.S.C. § 1332.

## LIABILITY

The plaintiff purchased a BH-123 cross-peen hammer from Donald Hodgdon, an authorized salesman and distributor of Snap-On, on June 6, 1969, in Concord, New Hampshire. According to the Snap-On Catalogue, the BH-123 is "[e]xcellent for the repair work since it has plenty of 'beef' to handle heavy tires. Also can be used for many other jobs such as straightening frames, bumper brackets, bumpers, puller work, etc." Pl. Ex. 2, p. 92. The Catalogue also states that "Federal Specs: GGG-H-86A applies to the BH-123 Hammer." Pl. Ex. 2, p. 92. Plaintiff usually received one or two of Snap-On's Catalogues each year and had perused the 1969 Catalogue. He bought the hammer for his job as a truck mechanic in Concord since it is customary for mechanics to own their own hand tools. Previously, he had purchased Snap-On tools in Manchester for his work and preferred them because he considered them to be the highest quality tools available. He did not know, however, that some Snap-On tools are not actually manufactured by Snap-On itself. In this case, the hammer had been manufactured by defendant Houdaille's Fairmount Tool and Forging Division for distribution by Snap-On and bore the stamped mark "Blue Point."

Plaintiff used the hammer at work primarily for driving king pins. In the summer of 1969, while using the hammer to form a channel iron bumper, plaintiff sustained a minor finger injury caused by a piece of metal. Later he noticed a chip missing from the hammer and suspected that the hammer was the source of the metal which had imbedded in his hand. He was not especially alarmed, but he did talk to the salesman, Hodgdon, about it, who told him that

there was no guarantee against chipping and refused to replace the hammer.[1]

Subsequently, on September 19, 1969, plaintiff was struck in the eye by a small piece of steel which chipped off the hammer while he was using it with a brass drift pin to remove a king pin from the front end of a bus.

Bernard Lement, plaintiff's expert metallurgist, examined, photographed, and tested the hammer after the accident. Pl. Ex. 22. Sections of steel had been cut from the hammer, but the chipped area containing a cavity was unchanged. That area, designated J434–9, was removed at Lement's direction and matched with the chip which had been removed from the plaintiff's eye. Lement found that the chip fit the cavity and concluded that it came from the hammer and, specifically, that portion of the hammer head designated J434–9. Deft. Ex. A, Pl. Ex. 12.

Lement then conducted hardness tests, a chemical analysis, magnaflux, dye penetrant, and microexamination tests on various sections of the head. On some portions he found long cracks which he attributed to a low forging temperature. On others, his microexamination disclosed partial decarburization. Decarburization is the removal of carbon from the surface of steel material, here a hammer head, caused by oxidation when steel is being worked on at high temperatures. Pl. Ex. 24, Deft. Ex. A. The higher the carbon content of steel, the harder it is. Complete decarburization results in ferrite, which has a very low carbon content (less than 0.02%), taking the place of the carbon on the surface of the material. Partial decarburization results in a mixture of ferrite and martensite. Martensite has a much higher carbon content than ferrite and is, consequently, a much harder material. Since ferrite is a relatively soft material, it will mushroom, work-harden, form cracks, and eventually chip as it is subjected to pressure, stress, and force. Decarburization was found at a depth of .012 inches in the cavity area and to various depths in other sections of the hammer head and, in Lement's opinion, had an adverse effect on the hammer and was the cause of the accident. To put it another way, a significant amount of ferrite due to decarburization was present in the chipped area causing fatigue cracks which progressed with successive hammer blows until failure occurred and the chip was ejected.

Lement compared the results of his tests for decarburization with Federal Specifications, incorporated in Snap-On's 1969 Catalogue, and found the hammer to be deficient in the following respects: although the overall carbon content was 0.78% and within specifications, carbon content was less than 0.02% in the cavity area; and the Government hardness specifications were not met in the ferrite areas of the hammer head. Pl. Ex. 6.

In Lement's opinion, the accident resulted from decarburization, and decarburization is a condition which can be detected by certain specific tests which were known to Snap-On, and eliminated or reduced by grinding the surface of the material, which Snap-On also knew.

Raymond Knudsen, Snap-On's Director of Product Research and Engineering, testified that 30% to 40% of its products are purchased from other manufacturers and distributed by Snap-On as its own products. Some of these products, including the BH–123 hammer, are identified by the "Blue Point" mark to distinguish them from products manufactured by Snap-On itself. Mr. Knudsen admitted, however, that the ultimate purchaser would naturally assume that "Blue Point" tools were manufactured by Snap-On. Snap-On sells its products through franchised dealers, primarily to customers who use tools in their trade,

---

1. The Snap-On Catalogue contains a guarantee which reads:

Any SNAP-ON hand tool or part which fails because of defective workmanship or material will be repaired or replaced when returned to a SNAP-ON representative or branch warehouse. Pl. Ex. 2, p. 1.

rather than the average home user. Accordingly, it expects its tools to be put to extensive and rigorous use.

Snap-On itself manufactures ball-peen hammers. It was, therefore, familiar with the problems caused by decarburization. It found that decarburization was a normal result of the forging process and worked out in its laboratory the grinding depth necessary to remove it. Pl. Ex. 3. Random lot samples of Snap-On's own hammers and other tools are tested for decarburization by microscopic examination and micro-hardness tests. Spot checks are occasionally made on tools received from other manufacturers, but Snap-On does not require that detailed specifications or tests for decarburization be followed by those manufacturers. Knudsen did not know whether any tests had been performed by Snap-On relative to Fairmount's hammer specifications, but he did testify that no tests had been made in 1969 on Fairmount products. Snap-On assumed that these products were satisfactory since Fairmount had been an excellent supplier and no complaints had ever been received about the BH-123 hammer. The only test of a BH-123 hammer that Knudsen knew of had been conducted in 1965. Pl. Ex. 7.

Knudsen examined the hammer purchased by the plaintiff, but could not express an opinion as to the cause of the chipping. He did state, however, that either misuse or improper manufacture was the probable cause. He conceded that using the hammer to pound a soft brass drift pin, as the plaintiff did, is not misuse, but added that misuse of the hammer at an earlier time could have been the precipitating factor which caused the hammer to chip. There was a great deal of testimony by Mr. Knudsen and other witnesses for the defendants as to how a hammer must strike its object with the head at exactly the right angle. Since those who use hammers professionally use them frequently and rapidly and under all sorts of conditions, it is inconceivable to me that the term "misuse" should be applied to the situation where the head is not at exactly the correct angle when it strikes an object. A hammer simply cannot, under repeated use, be held in exactly the same position time and time again.

The propensity of striking tools to chip, especially if defectively manufactured, has been known by the tool industry for a number of years, and Snap-On had considerable knowledge about the dangers of chipping. Snap-On, however, did not place any warnings about chipping on its hammers, although this had been considered prior to June of 1969.

Anthony Frantianne, President of Fairmount, testified that the type of hammer purchased by the plaintiff has been manufactured by his company for about twenty-five years. Fairmount does not employ a metallurgist and makes no special tests of its hammers. Visual inspection is made of incoming steel and heads are spot checked during the forging process for laps, cold shuts, and deep seams, all of which can cause chipping. After forging, the striking faces are ground to remove any such defects and the edges are beveled. The grinding might also remove or reduce the decarburated areas, but that is not its main purpose. No special grinding depth is required; the grinder is merely told to grind the face "clean." Fairmount did not consider it necessary to microscopically inspect its hammers. The only test Fairmount used on its hammers was the so-called Rockwell hardness test, which was used to determine if the hammer met Government hardness specifications. Fairmount only conducted magnaflux tests when they were requested by a purchaser and in those instances, the tests were conducted by an outside metallurgist. The hammers sold to Snap-On were never given any of the tests that Snap-On used on its own hammers, and Snap-On had never requested any special testing procedures. Mr. Frantianne readily admitted that a hammer that chipped after three months use would not be "a proper hammer."

## RULINGS

■■ Plaintiff's first claim is that Snap-On breached an express warranty. NH RSA 382-A:2-313 provides in pertinent part:

(1) Express warranties by the seller are created as follows:

\* \* \* \* \* \*

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

The 1969 Snap-On Catalogue states that Federal Specifications apply to the BH-123 hammer. In order to find an express warranty, it must be shown that the representations of fact describing the hammer were made "part of the basis of the bargain." In other words, plaintiff has the burden of showing that he acted on the basis of the representations. Speed Fastners Inc. v. Newsom, 382 F.2d 395 (10th Cir. 1967). There was evidence that plaintiff received the 1969 Snap-On Catalogue, but no evidence that he relied on the Catalogue description when he purchased the hammer. I rule, therefore, that plaintiff is not entitled to recover for breach of an express warranty.

■ Plaintiff also seeks recovery under the theories of implied warranty of merchantability and strict liability in tort. Since the evidence necessary to prove either is essentially the same in this case, and since either theory would afford a complete remedy, I only consider the question of whether defendants are strictly liable in tort.[2]

■ The New Hampshire Supreme Court has adopted the doctrine of strict liability in tort as grounds for recovery against the seller of a product which is in a defective condition unreasonably dangerous to the user or consumer.

Buttrick v. Arthur Lessard & Sons, 110 N.H. 36, 260 A.2d 111 (1969); Restatement (Second) Torts, s. 402A. Recovery under the strict liability doctrine requires the plaintiff to prove that the product was defective at the time of sale, that the defect made the product unreasonably dangerous, and that the defect caused the injury. Buttrick v. Arthur Lessard & Sons, *supra*.

Dr. Lement's testimony established that the hammer was decarburized in the chipped area and that the decarburization was the effective cause of the accident. Knudsen testified that decarburization is a serious problem which may result in chipping. Mr. Frantianne of Fairmount testified that if a hammer manufactured by Fairmount chipped within three months, it would not be "a proper hammer." I find that the hammer purchased by the plaintiff was defective and unreasonably dangerous at the time of purchase and that plaintiff's injuries were a direct result thereof.

The evidence also compels a finding that the plaintiff was contributorily negligent to some degree because he continued to use the hammer after it had chipped and injured his finger. Although he testified that he did not expect that the hammer would chip again, he must have been aware to some extent that it was defective, and he continued to use it.

Misuse of a defective product after purchase or assumption of the risk is a defense in products liability actions. The Restatement Comments provide a general guideline:

n. *Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a de-

2. I do not rule that recovery could not be based on an implied warranty of merchantability. I do suggest that strict liability in tort is a more appropriate remedy for the consumer who has received personal injuries and that U.C.C. warranties are best suited to commercial settings. Nelson v. Volkswagen of America, Inc., 315 F.Supp. 1120, 1123 (D.N.H. 1970); Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965).

fense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery. Restatement (Second) § 402A, Comment n.

■ Assumption of the risk is not distinguished from contributory negligence in New Hampshire, except in actions by an employee against his employer. Butler v. King, 99 N.H. 150, 106 A. 2d 385 (1954). Contributory negligence is a defense to strict tort liability and warranty liability. Buttrick v. Arthur Lessard & Sons, *supra;* Stephan v. Sears Roebuck, 110 N.H. 248, 266 A.2d 855 (1970).

Had the accident occurred just five weeks earlier, plaintiff's conduct would have been an absolute bar to recovery. On August 12, 1969, however, New Hampshire's comparative negligence statute became effective, and it repealed RSA 507:8 which had allowed contributory negligence as a complete defense in negligence cases. The new statute provides:

> *Comparative Negligence.* Contributory negligence shall not bar recovery

in an action by any plaintiff, or his legal representative, to recover damages for negligence resulting in death, personal injury, or property damage, if such negligence was not greater than the causal negligence of the defendant, but the damages awarded shall be diminished, by general verdict, in proportion to the amount of negligence attributed to the plaintiff; provided that where recovery is allowed against more than one defendant, each such defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed. The burden of proof as to the existence or amount of causal negligence alleged to be attributable to a party shall rest upon the party making such allegation. This section shall govern all actions arising out of injuries and other damages sustained on and after August 12, 1969, and none other. NH RSA 507:7-a.[3]

The question of whether the comparative negligence statute was meant to apply in personal injury cases other than actions in negligence is one of first impression in this jurisdiction. At the time of the passage of the comparative negligence statute, the New Hampshire Supreme Court had not yet adopted the doctrine of strict liability. There is no official legislative history of the statute and, even if we accept Senator Nixon's pertinent article in the New Hampshire Bar Journal as to legislative intent as being accurate, it does not touch directly

3. Soon after the statute was passed, it became apparent that problems might arise in applying comparative negligence where joint tortfeasors were involved in view of the no contribution among joint tortfeasors rule in New Hampshire. Scahill v. Miniter, 101 N.H. 56, 132 A.2d 140 (1957). This problem was discussed by Orcutt and Ross, Comparative Negligence in New Hampshire, 12 N.H.B.J. 6 (1969), and David Nixon, The Actual Legislative Intent Behind New Hampshire's Comparative Negligence Statute, 12 N.H.B.J. 17 (1969). In the instant case, however, there was an indemnity agreement whereby defendant Houdaille agreed, in effect, to hold Snap-On harmless and indemnify Snap-On from all liability, losses, costs, damages, and expenses on account of defective products. The question of whether the new statute changes the no contribution rule does not have to be answered in this case since the defendant Houdaille is the only one that has to respond in damages.

upon this issue. The Actual Legislative Intent Behind New Hampshire's Comparative Negligence Statute, 12 N.H.B.J. 17 (1969). It may be that had the legislature considered the question it would have intended comparative negligence to apply in products liability cases.[4] The Uniform Commercial Code has been in effect in New Hampshire for almost nine years and provided a remedy in product liability cases without regard to defendant's negligence, and many State Courts have held that contributory negligence was not a defense to warranty actions. Annot., 4 A.L.R.3d 501 (1965). It was not until 1970 that the New Hampshire Court held contributory negligence to bar recovery in a warranty action. Stephan v. Sears Roebuck, *supra*. I may also conjecture that the legislature never considered the problem at all, which is most likely, or considered it and, in view of the decisions of other State Courts, discounted it, or intended that the statute would only apply in negligence cases and not in products liability cases. Speculation aside, however, it is clear that the legislature intended to make it easier for a plaintiff to recover damages for death or injury to person or property in negligence cases by removing the absolute bar of contributory negligence.

The New Hampshire Supreme Court construed the contributory negligence statute so as to make it applicable as a defense in strict liability actions, even though the words of the statute say: "In all actions on the case for personal injury or injury to personal property, *caused by negligence*, . . . ." [Emphasis added.] NH RSA 507:8. This ruling was made despite the statement in the Restatement, *supra*: "Since the liability with which this Section deals is *not based upon the negligence of the seller*, . . . . [Emphasis added.] Comment n.

It must be observed that, despite the Restatement's position that strict liability is not based upon negligence, the allowance of contributory negligence or, as the Restatement prefers, the doctrine of assumption of the risk, as a defense injects at least a flavor of negligence into the strict liability doctrine. The precise question of whether a comparative negligence statute should apply in a strict liability case has been decided in Wisconsin which has a statute similar to the New Hampshire statute.[5] In 1967 the Wisconsin Supreme Court adopted strict liability in tort and applied it in a products liability case. Dippel v. Sciano, 37 Wis.2d 443, 155 N.W.2d 55 (1967).[6] The court held that comparative negligence did apply to strict liability in tort for the reason that it is actually grounded in negligence and amounts to a finding of negligence per se. Justice Hallows, concurring specially, rejected the Restatement position outright:

What we mean is that a seller who meets the conditions of sec. 402A, Restatement, Torts 2d, in Wisconsin is guilty of negligence as a matter of law and such negligence is subject to the ordinary rules of causation and the defense applicable to negligence. While the Restatement, Torts 2d, sec.

4. Since the statute only applies to accidents occurring after its effective date, it is not surprising that the New Hampshire Court has not yet considered this question. Buttrick v. Arthur Lessard & Sons, *supra*, held that contributory negligence is a bar to recovery in strict tort liability, but in that case, plaintiff had been injured in 1965.

5. It differs in several respects not pertinent to the instant case, *i. e.*, special verdicts are allowed, and contributory negligence equal to defendant's negligence bars recovery.

6. It is interesting to note that during the course of its opinion, the Wisconsin court refused to abolish privity requirements in warranty actions since it felt that to do so would require the use of legal fictions thought to be inappropriate. The result was a holding that in products liability cases, the plaintiff's exclusive remedy is strict liability in tort. The opinion has been commented on in a number of Law Reviews. 51 Marquette L.R. 208 (1967); 51 Marquette L.R. 388 (1967); 26 Washington and Lee L.R. 144 (1969); and 1968 Wisconsin L.R. 592.

402A, imposes a strict or absolute liability regardless of the negligence of the seller, we do not. At page 66.

■ ▇▇ While I shall not presume to say whether the New Hampshire Supreme Court would follow the same rationale as the Wisconsin Court, I predict that the New Hampshire Court would apply the comparative negligence statute to the contributory negligence of a plaintiff in a strict liability case. Certainly, the statute does not eliminate contributory negligence entirely as a defense, nor can it be cogently argued that the comparative negligence statute has no effect on contributory negligence at all in strict liability cases and remains a complete bar to recovery. Contributory negligence as a complete defense has been abolished in the State of New Hampshire. The comparative negligence of the plaintiff is now the standard that will be applied in any case involving death or injury to person or property in which the plaintiff's conduct may be a factor in causing the injury. I rule, therefore, that the comparative negligence doctrine must be applied to the conduct of the plaintiff and find that the amount of causal negligence attributable to the plaintiff in this case is 20%. I also find that both defendants are equally liable under the doctrine of strict liability in tort.

▇ Since the possibility of error always hovers over the opinion of a District Judge, particularly where he must predict as to what a State Court would do, I think it prudent to decide the negligence claim of the plaintiff. The facts make it clear that Snap-On was particularly knowledgeable as to the dangers posed by decarburization and chipping. It was fully aware of tests and procedures that could be used and were, in fact, used by it in the manufacture of its own products to reduce the hazards of decarburization and chipping. It had more extensive and special knowledge about the chipping propensities of striking tools than Fairmount, and probably more than the average hammer manufacturer. Despite this knowledge and the experience with its own tools, it imposed no manufacturing or testing requirements on Fairmount and did not even check Fairmount's hammers for defects that it knew or should have known might be present. It simply accepted Fairmount hammers on faith and sold them as its own but without applying its own standards of manufacturing and testing to them. Despite its know-how, it did not put a warning on the hammer, although it did consider doing so. Perhaps the crowning touch was the statement by Snap-On's salesman, Hodgdon, when approached by the plaintiff, that its hammers were not guaranteed against chipping. While perhaps not so calculated, this summary rejection of plaintiff's complaint could only serve to allay any fears on the plaintiff's part that the chipping was a serious defect or constituted a danger. I find that the defendant Snap-On was negligent in not inspecting and testing the hammers purchased from Fairmount, in not insisting that Fairmount meet Snap-On's design and testing specifications in the manufacture of its hammers, and in failing to take adequate steps to warn of the dangers of chipping.

While Fairmount's blind adherence to its time-worn manufacturing and testing procedures is not condoned, there is no evidence that Fairmount did not meet the standard of care of the average hammer manufacturer of reasonable prudence. There was no testimony as to industry wide practice and custom, and the only evidence as to industry procedure was limited to what Fairmount did and failed to do, and what Snap-On did and failed to do. I find, therefore, that, under the standard negligent test, Fairmount is not liable. The contributory negligence of the plaintiff, of course, remains at 20%.

### DAMAGES

▇ After the plaintiff was injured, he was taken to the hospital in Concord, New Hampshire, and examined by Dr. Cogswell, who observed that he had suffered a penetrating wound in the left

eyeball. The penetrating object had missed the cornea, entered the lens of the eye, and lodged midway in the vitreous. About four hours after the accident, the plaintiff was operated on and a steel chip, 5.5 mm x 3.5 mm, was removed from his eye. The wound was closed, and the plaintiff was able to see finger movements at a distance of two feet with the injured eye. He remained in the hospital one week and was discharged with unchanged vision. About a week later, he felt a sharp pain in his left eye and lost all vision in it. Thereafter, it was confirmed that plaintiff's retina had detached as a result of the original injury, and a scleral buckle operation was performed by Dr. Taylor Smith at the Massachusetts Eye and Ear Infirmary on October 29, 1969, to reattach the retina. The operation was successful and the retina was put back into fairly good position. Central vision was not and cannot be restored. Plaintiff's vision out of his left eye is limited to counting fingers at two feet. He has lost true depth perception. Although he does have side vision, he sees double images at night. The vision in his left eye is 20/2300 or 2400 at best and he is legally blind in that eye. Although the plaintiff has been able to compensate for the loss of depth perception as most people do under these circumstances, he has some trouble performing fully as a mechanic. He has difficulty judging distances, working in garages with low light levels, and is acutely conscious of the fact that injury to his right eye may result in total blindness. Because of double images driving at night for long distances is a problem for him, although this can be eliminated by completely covering the left eye. He complains of eye strain in his good eye which, with other side effects, prevents him from working as many overtime hours as he worked before the accident, although he is able to work a full eight hour day. In short, plaintiff has incurred a serious vision impairment which is permanent and not correctable. The plaintiff's life expectancy is 34.24 years.

Payroll ledgers from Patsy's Garage, Pl. Ex. 16, shows that plaintiff generally worked between fifty to sixty hours a week before the accident, and occasionally put in over sixty hours. He returned to Patsy's full time in late January of 1970, but was not able to put in much overtime because of his injury. In May of 1969 he left Patsy's and briefly went into business for himself. From October, 1970, until the end of March, 1971, he worked at Ferns Oil Company, Pl. Ex. 11. Presently he works at Grappone, Inc., as a heavy equipment mechanic. He generally works a forty hour week with little overtime, and his average weekly income is somewhat below his average 1969 weekly income. Pl. Ex. 13. Based on his average weekly earnings prior to the accident, I find that his loss of earnings to date, including loss of overtime, is about $3,000. I also find that his earning capacity as a mechanic has been permanently reduced by 12% to 15%.

On December 19, 1970, over a year after receiving the injury to his eye, plaintiff was admitted to the Concord Hospital with a bleeding duodenal ulcer. He had been treated for an ulcer ten years earlier, and from time to time had trouble with it. Pl. Ex. 5. He was discharged from the hospital in improved condition on December 21, 1970. Dr. Nydegger testified that, in his opinion, the ulcer was caused by emotional or physical stress and the cortisone therapy which plaintiff had undergone in connection with his eye injury. I find that this ulcer condition, although not permanent, was a direct and proximate result of the injury to his left eye.

I have considered the following factors in assessing the plaintiff's damages: the extent and nature of the injury, the ulcer condition, the pain and suffering that the plaintiff has endured, the mental anxiety that the plaintiff will probably have in the future because of his fear of injury to his right eye, the nature of the plaintiff's work as a mechanic, the loss of earnings, the permanent reduction in his earning capaci-

ty, his medical bills, and the fact that he has 20/20 vision in his right eye and has learned to compensate to a considerable extent for the loss of vision and depth perception in his left eye. I find that the sum of $105,000 is fair and adequate total damages for the plaintiff Richard P. Hagenbuch. This sum, reduced by the comparative contributory negligence factor of 20%, results in a damage finding for the plaintiff Richard P. Hagenbuch in the amount of $84,000.

█ Plaintiff Joan Hagenbuch, Richard's wife, testified that her husband did not require any special care when he returned from the hospital after the injury to his eye, but that his injury did cause her inconvenience since she does not drive a car and was dependent on taxi cabs until her husband was able to resume driving in about four to six weeks. She was worried and upset after the initial injury due to concern over her husband's condition and fear that his earning capacity would be drastically curtailed. I assess damages for Joan Hagenbuch for loss of consortium in the amount of $1,000.

So ordered.