PAN–ALASKA FISHERIES, INC., a corporation, and IDS Leasing Corporation, Plaintiffs-Appellants,

Pan-Alaska Fisheries, Inc., Plaintiff-Appellee,

v.

MARINE CONSTRUCTION & DESIGN CO., a corporation, Northern Commercial Company, a Delaware Corporation, d/b/a N. C. Marine, and Caterpillar Tractor Company, a corporation, Defendants-Appellees.

NORTHERN COMMERCIAL COMPANY, a Delaware Corporation, d/b/a N. C. Marine, Third-Party Plaintiff-Appellee,

v.

FRAM CORPORATION, a Foreign Corporation doing business in the State of Washington, Third-Party Defendant-Appellee.

No. 75–3723.

United States Court of Appeals, Ninth Circuit.

Dec. 13, 1977.
Rehearing Denied Jan. 18, 1978.

Gordon W. Moss (argued), of Lane, Powell, Moss & Miller, Seattle, Wash., for Pan-Alaska Fisheries, Inc.

William R. Hickman (argued), Seattle, Wash., for N. C. Marine.

Before KILKENNY and ANDERSON, Circuit Judges, and CRAIG,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

At noon on Christmas Day, 1969, the 76-foot crab fishing vessel Enterprise sailed from Seattle, Washington, bound for Unalaska, Alaska, on its maiden voyage following a major rebuilding of the vessel, which included the installation of a new Caterpillar D-343 marine diesel engine. Approximately thirteen hours later when the vessel was abeam of Nanaimo, British Columbia, in the Strait of Georgia, a fuel oil fire broke out in the engine room, resulting in the sinking and total loss of the vessel, its equipment, fishing gear, provisions and supplies aboard. The crew escaped in a life raft. This admiralty action in negligence and products liability arises from that loss.

THE PARTIES

Pan-Alaska Fisheries (Pan-Alaska), plaintiff, long-term lessee and owner *pro hac vice* of the vessel Enterprise;

Caterpillar Tractor Company (Caterpillar), defendant, and manufacturer of the Caterpillar D-343 marine engine, who sold the engine, including two factory-equipped engine-mounted fuel filters, No. 6L7440, to

Northern Commercial Company, d/b/a N. C. Marine (N. C. Marine), defendant, the exclusive franchised dealer for Caterpillar in Western Washington, who sold and delivered the engine to

* The Honorable Walter E. Craig, Chief Judge, United States District Court, District of Arizona, sitting by designation.

Marine Construction & Design Company (Marco), defendant, engaged in the business of constructing, repairing, and rebuilding fishing vessels. Marco installed the engine in the Enterprise pursuant to its contract with Pan-Alaska to rebuild the vessel, which included, among other things, the furnishing and installation of a new Caterpillar D–343 marine diesel engine, equipped with fuel filters and engine and pilot house instruments and controls.

## FACTS [1]

### THE REBUILDING OF THE ENTERPRISE

In early 1969, the Enterprise sank at its dock at Unalaska, Alaska, and was refloated and navigated to Seattle, Washington, where Pan-Alaska decided to have the vessel rebuilt. Pan-Alaska hired Marco to rebuild the Enterprise (according to Pan-Alaska's specifications) and ordered Marco to install in the Enterprise a new Caterpillar D–343 marine engine. Marco purchased this engine from Caterpillar's local distributor, N. C. Marine, and installed it in the Enterprise. This engine had been manufactured in March of 1969 by Caterpillar and sold and shipped to N. C. Marine in April of that year. Mounted on the engine shipped to N. C. Marine were two factory-equipped fuel filters, Caterpillar part No. 6L7440, which, as we shall see, played a crucial role in the loss of the Enterprise.

The vessel, as rebuilt, was "pilot-house controlled;" that is, it was designed and intended to be operated without an engineer on watch at all times in the engine room. There was one important exception to this pilot-house control and that was that there was no way to either start or stop the engine except from within the engine room itself.

### THE FUEL FILTERS

The D–343 engine is manufactured with two diesel fuel filters mounted in tandem on the starboard side of the engine and located between the engine's fuel pump and the intake to the cylinders where the fuel is fired. These engine-mounted fuel filters are the second line of defense against contaminated fuel; a primary fuel filter, not supplied by Caterpillar, was installed by Marco in the fuel line leading to the engine from the fuel tanks under the deck plates of the engine room.

Commencing in February 1969, Caterpillar began receiving numerous complaints from its dealers regarding failures of 6L7440 fuel filters (installed and sold by Caterpillar for use on its D–343 engines), including some reports of engine room fires being caused by such filter failures. The 6L7440 filters were found to be rupturing or cracking under designed fuel pressures, and in some cases with very few hours of engine operation. As a result of these complaints, Caterpillar initiated an investigation and testing program which confirmed that the 6L7440 fuel filter was unsatisfactory for use on D–343 engines.

In the early fall of 1969 Caterpillar developed a modified filter to which it assigned part No. 1P2299. On October 20, 1969—some nine days before delivery of the Enterprise's engine by N. C. Marine to Marco—Caterpillar mailed to all of its dealers, including N. C. Marine, a "product letter" regarding the 6L7440 fuel filters. This product letter instructed the dealer to "Advise all owners of D–343 engines in all applications to discontinue using the 6L7440 Fuel Filter Assemblies in these engines," to substitute the new 1P2299 Filter Assembly, and that "In some cases, the former filter has failed on D–343 engines and sprayed fuel over the engine and nearby areas." The product letter instructed the dealers to furnish the owners with the new filters as soon as possible. The trial court found that N. C. Marine did not change the 6L7440 filters on the Enterprise's engine or advise Marco or Pan-Alaska to change the filters or warn them of any hazards connected with the filters. On its fateful voyage, the filters on the Enterprise's D–343 engine were the 6L7440 filters and not the replacement 1P2299 filters.

---

1. These facts are taken largely from the trial court's findings of fact. (C.R. 356–366)

Even with the knowledge that a fire hazard existed for vessels at sea equipped with the D-343 engine and 6L7440 filters, Caterpillar did not determine whether N. C. Marine had complied with Caterpillar's instructions contained in the October 20, 1969, product letter. It further appears that Caterpillar made no direct contact or had any type of communication with either Pan-Alaska or Marco regarding the problem filters.

## THE VOYAGE

After Marco completed its work, approximately 200 gallons of fuel were transferred from the Pan-Alaska vessel Mercator to the Enterprise. This fuel was contaminated and the contaminated fuel was drained from the fuel tank aboard the Enterprise into the bilges of the ship and then pumped through the bilge pump into Puget Sound. These fuel tanks had been in use when the Enterprise sank in Unalaska and were still on board and in use when it left Seattle. The trial court found that they had not been cleaned when the Enterprise was overhauled nor any other time before the vessel left Seattle.

At noon on December 25, 1969, the Enterprise sailed from Seattle for Unalaska on its maiden voyage with a crew of three: Leif Loklingholm, Master; John Froyen, Engineer; and Lawrence Cole, cook-deckhand. Around 7 or 8 o'clock in the evening, the engine slowed down and the engineer changed the primary filter located under the floor plates because he found dirt in it.

At approximately 1:30 a. m., the next morning, the Enterprise was passing Nanaimo, British Columbia, when Froyen, on watch in the pilot-house, saw the needle on the fuel pressure gauge drop. An inspection of the engine revealed that the forward fuel filter had developed a three-quarter inch by one-eighth inch crack, which was spraying diesel fuel six to eight feet around the engine room and on the starboard fuel tank. Froyen stopped the engine, replaced the cracked 6L7440 filter and replaced it with a spare 1P2299 filter. After wiping up the spilled fuel with rags,

Froyen restarted the engine and observed it operate for several minutes at an idle speed. He did not observe the engine or filters at full speed. Because he had a headache, Froyen left the engine room to get a glass of milk. He told the Master to put the engine on full-ahead, which he did.

Shortly after the engineer entered the galley, a fuel oil fire broke out in the engine room. The thick black choking smoke prevented the crew members from entering the engine room to either fight the fire or shut off the engine, which was still running.

Pan-Alaska had not trained the crew in fire-fighting techniques, nor did it learn whether the crew was familiar with the safety features of the vessel. One essential element of a burning fire is oxygen. Oxygen was fed to the engine room via an electric blower and the engine room air ducts. The crew did not know that they could turn off the blower by a switch outside the engine room or by cutting the blower's wires. Nor did they know they could reduce the flow of air to the fire by stuffing the engine room air ducts. Consequently, the blower remained on and the air ducts open feeding the fire with the essential oxygen.

The ship's portable fire extinguishers were expended in an unsuccessful attempt to put out the fire. When the deck planks got warm, the crew abandoned ship in a rubber raft. The Enterprise then burned and sank. All equipment, fishing gear, provisions and supplies were lost.

## PROCEEDINGS BELOW

Originally, in April 1970, Pan-Alaska filed suit in the King County, Washington, Superior Court seeking recovery of $210,190.44 against Marco and N. C. Marine. In the fall of 1971 Caterpillar was added as a third-party defendant by N. C. Marine. Thereafter, Pan-Alaska filed an amended complaint in which Caterpillar was added as a defendant. The case proceeded before a state court jury. However, after hitting a procedural snag in the state court, Pan-Alaska took a voluntary nonsuit in the case,

as permitted by Washington State court rules, and filed a new action in federal court under the court's admiralty jurisdiction [28 U.S.C. 1333]. The complaint sought recovery against Marco, N. C. Marine and Caterpillar.

Relying on the state court transcripts, depositions, and some further testimony, the trial court found under the theory of negligence that N. C. Marine alone was subject to liability to Pan-Alaska. The trial court also found that Pan-Alaska was contributorily negligent, and therefore awarded Pan-Alaska a judgment against N. C. Marine for one-half the cost of the Enterprise, according to the admiralty rule of equally-divided damages established in *The Schooner Catharine v. Dickinson*, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1885). On appeal, another panel of this court, pursuant to a motion, remanded the case for reconsideration in light of *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), which overruled *The Schooner Catharine* and adopted a rule of pure comparative fault.

On remand the district court concluded that N. C. Marine was one-third responsible for the loss of the Enterprise and that Pan-Alaska was two-thirds responsible. The court adjusted the damages accordingly. *See* 402 F.Supp. 1187 (W.D.Wash.1975). Pan-Alaska appeals.

## NEGLIGENCE THEORY

As mentioned, the trial court found N. C. Marine alone liable to Pan-Alaska under the theory of negligence. The court found that the probable cause of the fire was the rupture or failure of the remaining 6L7440 engine-mounted fuel filter which permitted diesel oil to spray out and contact the hot engine parts where the fuel was ignited. The court also held that N. C. Marine was negligent in failing to change the 6L7440 fuel filters after it received the product letter of October 20, 1969, from Caterpillar and in failing to advise either Marco or Pan-Alaska to make the change. The court also found N. C. Marine negligent in failing to warn them of the danger of using the 6L7440 fuel filters.

On the other hand, the trial court found that Pan-Alaska and the Enterprise's crew were contributorily negligent for the following reasons:

(1) The engineer was negligent in leaving the engine room before operating the engine at full-speed-ahead and without observing the engine and the filters operate under the higher fuel pressures generated under those conditions.

(2) The engineer was particularly negligent in not observing the engine under full load conditions when he knew or should have known that the fuel supply was contaminated.

(3) The crew was negligent in failing to find out that a switch outside the engine room controlled the blower which was forcing air into the engine room.

(4) The crew was negligent in not cutting the wires leading to the blower.

(5) The crew was negligent in not stuffing the air ducts to stop the engine and stop the flow of air into the fire.

(6) Pan-Alaska was negligent in not equipping the Enterprise with a means of shutting off the engine from outside the engine room.

(7) Pan-Alaska was negligent in not training the crew in firefighting techniques.

And, in concluding, the trial court found:

"The defective engine filters and the negligence of the plaintiff and its crew were each actual, proximate, and concurring causes of the loss of the vessel. The vessel would not have been lost had the defective filter not started a fire. The fire would not have caused the loss of the vessel had the vessel been properly equipped and had the crew been more competent and had the engineer stayed in the engine room to observe the newly installed filters under full-ahead conditions." (C.R. 365)

As for Marco and Caterpillar, the trial court found no negligence on their part. As to Marco, the court found that Marco had no knowledge of the design defect in

the filters and was not negligent in connection with the purchase, installation, or furnishing of the engine to Pan-Alaska. The court also found that Caterpillar acted reasonably and with due care when it sent N. C. Marine the product letter of October 20, 1969.

■ On appeal, Pan-Alaska contends that the above-cited findings by the trial court are clearly erroneous and not supported by the evidence. We disagree. Quite the contrary, we find that the trial court's findings *are* supported by the evidence and that they are not "clearly erroneous." As such, we will not disturb them on appeal. *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954). However, we must remand this issue for the trial court to reconsider along with and in light of our other holdings in this case.

## DOCTRINE OF STRICT PRODUCTS LIABILITY

On this issue of strict products liability, the trial court found that:

"Under the particular facts of this case the doctrine of strict liability is not applicable. Even if the doctrine were applicable, it would not have increased the liability of N. C. Marine nor would it have made any other defendant liable." (C.R. 367)

Because we find this conclusion to be erroneous, we vacate and remand for further proceedings.

## I. STRICT LIABILITY IN ADMIRALTY

■ The first question which confronts us here is whether or not the legal theories of strict liability in tort now so prevalently applied on land can be applied to suits in admiralty. We hold that strict products liability actions have become sufficiently well-established to justify its being incorporated into the law of admiralty. By so holding, we join several other circuits and several of our own district courts who have

already applied strict liability to admiralty law.

In *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631 (8th Cir. 1972), the Eighth Circuit held that:

"We further conclude that federal maritime law should and does apply the doctrine of strict liability in tort. . . ." (460 F.2d at 635)

\* \* \* \* \* \*

"We hold that the correct law to be applied to this case is expressed in Restatement (Second) of Torts § 402–A (1965), as it is the best expression of the doctrine as it is generally applied, and for the additional reason that several federal courts have previously used that section in maritime cases. *McKee v. Brunswick Corp.*, 354 F.2d 577, 584 (7th Cir. 1965); *Ohio Barge Line, Inc. v. Dravo Corp.*, 326 F.Supp. 863, 865 (W.D.Pa.1971); *Soileau v. Nicklos Drilling Co.*, 302 F.Supp. 119, 127 (W.D.La.1969). The doctrine as enunciated in the Restatement has been approved and applied by a number of state courts.[2] [cites omitted] We think the doctrine of strict liability in tort has been accepted and adopted by a sufficient number of states so that it is now . . a part of tort case law that should be embraced by federal maritime law. This also fulfills one of the primary goals of maritime law, uniformity." (460 F.2d 636–37).

And, in *Schaeffer v. Michigan-Ohio Navigation Co.*, 416 F.2d 217 (6th Cir. 1969), that court held:

"We believe that a products liability claim will lie in admiralty court." (416 F.2d at 221)

*Accord: McKee v. Brunswick Corp.*, 354 F.2d 577, 584 (7th Cir. 1965); *Streatch v. Assoc. Container Transp. Ltd.*, 388 F.Supp. 935 (D.C.Cal.1975); *Renner v. Rockwell International Corp.*, 403 F.Supp. 849 (C.D.Cal. 1975); *Sears, Roebuck and Co. v. American*

---

**2.** Section 402–A of the Restatement has been adopted by a substantial majority of the states which have considered the issue. *See, e. g., Shields v. Morton Chemical Co.*, 95 Idaho 674,

518 P.2d 857, where the Idaho Supreme Court noted in 1974 that it was the thirty-seventh jurisdiction to adopt the strict products liability doctrine as set forth in Section 402–A.

*President Lines, Ltd.,* 345 F.Supp. 395 (N.D. Cal.1971); *Taisho Fire & Marine v. Vessel Montana,* 335 F.Supp. 1238 (N.D.Cal.1971); *In re Alamo Chemical Trans. Co.,* 320 F.Supp. 631 (S.D.Tex.1970). *See also, Sanderlin v. Old Dominion Stevedoring Corp.,* 385 F.2d 79 (4th Cir. 1967); *Houston-New Orleans, Inc. v. Page Engineering Co.,* 353 F.Supp. 890 (E.D.La.1972); and, McCune, "Maritime Products Liability." 18 Hastings L.J. 831–868 (1967). *Cf., Sieracki v. Seas Shipping Co.,* 149 F.2d 98 (3rd Cir. 1945), *aff'd,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

As these authorities suggest, and we so hold, an action based on strict products liability will lie in admiralty. And since Section 402–A of the Restatement (Second) of Torts is the best and most widely-accepted expression of the theory of strict products liability, we accept 402–A as the law of products liability in this circuit, at least for this case arising in admiralty.

402–A reads as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

■ Under the doctrine of strict products liability, manufacturers, like Caterpillar, dealers, like N. C. Marine, and retailers, like Marco, are all subject to liability because "[t]hey are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products." *Vandermark v.*

*Ford Motor Co.,* 61 Cal.2d 256, 37 Cal.Rptr. 896, 899, 391 P.2d 168, 171 (1964). *See also* the landmark strict products liability case of *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962) and Section 402–A, comment "f", *infra.*

■ Marco contends that it cannot be subject to liability under strict products liability because there was no sale and because Marco is not in the business of selling engines. First, Marco is hardly in a position to deny that there was a sale, for the trial court found, "in fulfillment of its contract with Pan-Alaska, Marco purchased from N. C. Marine and installed on the vessel a Caterpillar D–343 engine . . ." (C.R. 358). Second, even if Marco is not a "merchant" of engines within the meaning of U.C.C. § 2–314, Marco is not so casual a dealer in marine equipment as not to be considered a "seller" for strict liability purposes. Comment "f" to Section 402–A states:

"The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, . . . . It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home."

Comment "f" goes on to state that the rule does not apply to the occasional seller of food or other such products "who is not engaged in that activity as a part of his business." Clearly, Marco does not fit here because the purchase, sale and installation of the engine were part of Marco's business. The examples given in Comment "f" to illustrate sellers who are not in the business of selling are of "the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar." and of "the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer

in used cars, . . . ." Marco's sales of marine engines are not nearly so casual that it should escape liability.

When the trial court apportioned the relative percentage of damages, it did so under the erroneous belief that strict products liability did not apply and that only N. C. Marine was liable under negligence theories. Since strict products liability does apply and Caterpillar and Marco should be considered in the relative percentage apportionment of damages, we vacate the trial court's judgment and remand for further consideration in light of this opinion.

On remand, we see two potential problem issues. The first [3] is Caterpillar's contention that it should escape liability because of its "product letter" of October 20, 1969, which warned N. C. Marine of the defective 6L7440 filters on the D–343 engine. The second issue regards allocating or apportioning the relative percentage of liability amongst "strictly liable" defendants and a "contributorily negligent" plaintiff.

## II. CATERPILLAR'S PRODUCT LETTER

■ As to the first issue, we hold under these facts that Caterpillar cannot escape liability under the theory of strict products liability just because it warned N. C. Marine, its immediate purchaser and dealer. We adopt the reasoning of Justice Traynor in *Vandermark v. Ford Motor Co., supra,* wherein he stated:

"Since . . . the manufacturer of the completed product, cannot delegate its duty to have its [products] delivered to the ultimate purchaser free from dangerous defects, it cannot escape liability on the ground that the defect in [the product] may have been caused by something one of its authorized dealers did or failed

to do." (37 Cal.Rptr. at 899, 391 P.2d at 171)

Another example of the irrelevance of the notice to N. C. Marine alone is the closely analogous case of *Ford Motor Co. v. Robert J. Poeschl, Inc.,* 21 Cal.App.3d 694, 98 Cal. Rptr. 702 (1971). The *Poeschl* case was a strict products liability case where Ford had manufactured a car with defective tail lights. Ford knew the lights were defective and issued a recall warning notice. Ford's dealer failed to act upon the recall notice and the consumer was injured by the defect. Ford settled the claim by the consumer and sought indemnity from the dealer. In rejecting the argument that Ford's fault was merely "passive" and the dealer's was "active," the court stated that:

"Even if the vehicle had reached the customer's hands when the manufacturer discovered the defect, it could have plucked the flower of safety out of the nettle of danger by locating the owner and notifying him of the defect.

"By notifying the dealer alone, Ford could not shift to the dealer the direct obligation of safety it owed the customer. [citing *Vandermark v. Ford Motor Co., supra*] Ford's production of the defective car, coupled with its failure to attempt direct notice to the customer, breached a direct obligation it owed the latter." (98 Cal.Rptr. at 705)

*See also, d'Hedouville v. Pioneer Hotel Co.,* 552 F.2d 886, 892–3 (9th Cir. 1977), and *Jackson v. Coast Paint & Lacquer Co.,* 499 F.2d 809, 812 (9th Cir. 1974) where we noted knowledge of the risk or defect in the product by an intermediate seller in the chain of distribution does not immunize the manufacturer from liability. *Cf. Brizendine v. Visador Company,* 437 F.2d 822 (9th Cir. 1970) where, in a case dealing with Section 388 [4] of the Restatement (Second) of Torts, we held that a glass manufacturer-suppli-

---

**3.** Caterpillar also argues that it should escape liability because there was no defect in the D–343 engine by itself and there was no defect in the 6L7440 filter by itself. Rather, it was the combination of these two which created the problem. This argument, of course, is completely without merit. Such argument ignores the fact that Caterpillar designed and built the D–343 engine and chose the filters which it

mounted on the engine. If the filters were too weak to withstand the pressures generated by the D–343 engine, then the whole package was defectively designed and will subject Caterpillar to liability.

**4.** Section 388 reads:
"Chattel Known to be Dangerous for Intended Use

er's duty to warn (that certain glass was not safe for use in doors) "is not limited to warning the immediate purchaser." (437 F.2d at 828)

■ In this case Caterpillar built the D–343 engine on which it chose and mounted the 6L7440 filters. Before this engine-filter combination came into the hands of the ultimate consumer (Pan-Alaska), Caterpillar knew that the filters could not withstand the strain created by the D–343 engine. It knew that the filters could crack and spray fuel on a hot engine and it knew that this created an extreme fire hazard. Since this D–343 engine was a marine engine, it knew that this engine-filter fire hazard would be placed on vessels sailing the high seas. It takes little imagination to realize that a fuel fire on a vessel while at sea is an extremely dangerous situation to both life and property (as the fate of the Enterprise so aptly illustrates). To allow a manufacturer to insulate itself from liability for harm caused by a defective product (which it built, designed and placed into the stream of commerce) by merely sending a single warning notice to its dealer would defeat the policy and purpose of strict products liability which is to protect the consumer, who is oftentimes unwary or unable to protect himself and to place the liability on those who are responsible for the harm and best able to absorb the loss. Therefore, we hold that Caterpillar's "product letter" of October 20, 1969, to N. C. Marine was ineffective to insulate it from liability under the theory of strict products liability.

III. COMPARATIVE NEGLIGENCE (COMPARATIVE FAULT) AND STRICT PRODUCTS LIABILITY

■■ Once it has been determined that a certain manufacturer, dealer, supplier or retailer is liable under the theory of strict products liability, and that a plaintiff has been contributorily negligent in causing the harm or loss, our inquiry then is whether or not the relative degrees of each party's fault or responsibility can be compared in order to apportion the relative percentage of the liability to each party. Or, in other words, does the doctrine of comparative negligence (comparative fault) apply as a partial defense to a claim based on the concept of strict products liability? We believe that it can.

Several courts in jurisdictions which have adopted the doctrine of strict products liability, as well as comparative negligence statutes, have applied the two concepts together. We feel that this is the better-reasoned view. *See,* for example, *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276 (5th Cir. 1975), *Hagenbuch v. Snap-On Tools Corp.,* 339 F.Supp. 676, 682 (D.N.H.1972), *Sun Valley Airlines v. Avco-Lycoming Corp.,* 411 F.Supp. 598 (D.Idaho 1976), *Butaud v. Suburban Marine and Sporting Goods, Inc.,* 555 P.2d 42, 45 (Alaska 1976), *Powers v. Hunt-Wesson Foods, Inc.,* 64 Wis.2d 532, 219 N.W.2d 393 (1974), *Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55 (1967).

■ *Edwards v. Sears, Roebuck and Co., supra,* involved Mississippi's comparative negligence statute and strict products liability. At issue was a defective tire and plaintiff's decedent who was possibly intoxicated and driving at an excessive speed. The trial court instructed the jury to compare the conduct of the defendants and the decedent and if both contributed to the cause of the accident, then the plaintiff's damages were to be reduced in proportion to the

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier "(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."
While section 388 is directed to suppliers of chattels in general, section 394 expressly places the same duty upon manufacturers of chattels.

extent the decedent's negligence contributed to the accident. The Fifth Circuit agreed and stated that "the trial court took the correct path through the thicket of strict liability and contributory negligence." (512 F.2d at 290). The court then went on to remark with approval that:

". . . a noted commentator has suggested that the proper interaction between strict liability and contributory negligence 'should be apparent on reflection. It is to apply a system of comparative fault of the "pure type" and apply it to strict liability as well as negligence.' Wade, Strict Tort Liability, 44 Miss.L.J. 825, 850 (1973)." (Id.)

And in *Butaud v. Suburban Marine and Sporting Goods, Inc., supra,* the Supreme Court of Alaska, in a well-reasoned opinion, applied comparative negligence to strict products liability and stated:

"In breaking new ground in this area of the law, we feel that the public policy reasons for strict product liability do not seem to be incompatible with comparative negligence. The manufacturer is still accountable for all the harm from a defective product, except that part caused by the consumer's own conduct." (555 P.2d at 46)

We adopt the reasoning of the above-cited cases and hold that comparative fault (i. e., contributory negligence) concepts can be applied to the doctrine of strict products liability.[5]

Once the doctrine of strict products liability has been applied to admiralty, the adoption of the concept of comparative fault is especially easy since the doctrine is not new to admiralty, but has been applied in circumstances other than products cases.

Recently, the Supreme Court, in *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1716, 44 L.Ed.2d 251 (1975), reconsidered the old admiralty rule of equally divided damages in collision cases where both parties are at fault, and held that:

". . . when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for *such damage is to be allocated among the parties proportionately to the comparative degree of their fault,* and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." (emphasis added)

Admiralty courts have also long applied the principle of comparative fault in actions based on a species of strict liability, unseaworthiness.

In *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 408–9, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953), the Supreme Court rejected the notion that contributory negligence be recognized as a complete defense in a case of unseaworthiness:

"The harsh rule of the common law under which contributory negligence wholly barred an injured person from recovery is completely incompatible with modern admiralty policy and practice. Exercising its traditional discretion, admiralty has developed and now follows its own fairer and more flexible rule which allows such consideration of contributory negligence in mitigation of damages as justice requires. Petitioner presents no persuasive arguments that admiralty should now adopt a discredited doctrine which automatically destroys all claims of injured persons who have contributed to their injuries in any degree, however slight."

And, in maritime personal injury actions under the Jones Act [46 USC 688] and the Death on the High Seas Act [46 USC 761, 766], courts have long applied the concept of comparative fault. For example, 46 USC § 766 states that:

". . . the fact that the decedent has been guilty of contributory negligence shall not bar recovery, but the court shall take into consideration the degree of neg-

---

5. This decision does not conflict with *Ryan v. Foster & Marshall, Inc.,* 556 F.2d 460 (9th Cir. 1977). *Ryan* was not an admiralty case. Here we have neither a situation of gross negligence to compare nor is there any statute or other state law to interpret and apply.

ligence attributable to the decedent and reduce the recovery accordingly."

When we find that the "fault" of each party will be compared, what we mean by "fault" is that party's blameworthy conduct which contributes to the proximate cause of the loss or injury. While applying comparative fault (or negligence) principles to strict liability does create some conceptual problems, "this problem is more apparent than real." *Butaud v. Suburban Marine and Sporting Goods, Inc., supra* (555 P.2d at 45).

■ By applying the term "comparative fault" as a catchall to encompass all the involved parties' conduct, we feel that a common denominator has been reached to compare the manufacturer's conduct in manufacturing and selling a defective product and the plaintiff's unreasonable conduct which is a contributing cause to his own injuries. We do note in passing that perhaps the term "comparative causation" (*see Sun Valley Airlines v. Avco-Lycoming, supra*, 411 F.Supp. at 603–4) is a conceptually more precise term than "comparative fault" since fault alone without causation does not subject one to liability. However, because the term "comparative fault" seems to be commonly accepted and used (*see, e. g., United States v. Reliable Transfer Co., supra; People of State of California v. Italian Motorship Ilice*, 534 F.2d 836, 843 (9th Cir. 1976); *Crown Zellerbach Corp. v. Willamette-Western Corp.*, 519 F.2d 1327 (9th Cir. 1975)) and since in this case we tie the concept of comparative fault to the proximate cause, we shall not confuse the "thicket" of comparative fault and strict liability with yet another label. In any event, whether we use the term comparative fault, contributory negligence, comparative causation, or even comparative blameworthiness, we are merely beating around the semantical bush seeking to achieve an equitable method of allocating the responsibility for an injury or loss. It comes down to this: the defendant is strictly liable for the harm caused from his defective product, except that the award of damages shall be reduced in proportion to the plaintiff's contribution to his own loss or injury.

## IV. DEFENDANTS' DEFENSES

■ Once we have determined that the plaintiff's fault can be compared to the manufacturer's (or dealer's, supplier's, etc.) liability for a defective product, our next inquiry is what conduct of the plaintiff can be compared. In short, we hold that *all* of plaintiff's conduct contributing to the cause of his loss or injury can be compared to the defendants' liability, regardless of the labels attached to that conduct.

We are aware that comment "n" to Section 402–A of the Restatement states that:

"Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand, the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section. . . ."

However, we feel that these labels are merely refugees from the old, harsh "all-or-nothing" rule of contributory negligence which is quickly losing favor throughout the United States. In holding that all of plaintiff's conduct can be compared to the defendants' conduct, we find that any label in comment "n" which either allows plaintiff to recover full damages, even though he was partially at fault, or which totally bars his recovery, even though the defendant was partially at fault, is not consistent with comparative fault principles and is therefore rejected. *See, e. g., Sun Valley Airlines v. Avco-Lycoming Corp., supra* (411 F.Supp. at 603), and *Butaud v. Suburban Marine and Sporting Goods, Inc., supra* (555 P.2d at 44).

Such "all-or-nothing" defenses are inequitable in their operation because they fail to distribute responsibility in proportion to fault and place upon one party the entire burden of a loss for which two are, by hypothesis, responsible. If, for example,

**1140**

the user's conduct in failing to discover or guard against the product's defect is highly irresponsible and the product's defect slight, it offends our sense of justice and fair play to impose the whole loss on the manufacturer in the name of imposing the burden of defective products on manufacturers as one of the costs of doing business. There is no reason why other consumers and society in general should bear that portion of the burden attributable to the plaintiff's own blameworthy conduct.

CONCLUSION

In sum, we hold that strict products liability actions will lie in admiralty and that the principles of comparative fault can be applied to these strict liability actions. Since the trial court held that strict liability did not apply, we must vacate and remand the judgment for the court to reconsider in light of this opinion. And, while we have no quarrel with the trial court's findings and judgment on the negligence issue, we feel that this also should be remanded and reconsidered in the light that the doctrine of strict products liability is applicable to this case.

VACATED and REMANDED.