69 F.3d 1432
 1995 A.M.C. 2908, 64 USLW 2283, 95
Cal. Daily Op. Serv. 8322,
95 Daily Journal D.A.R. 14,405
 SARATOGA FISHING CO., Plaintiff-Appellee,
v.
MARCO SEATTLE INC., Defendant-Appellant,
and
J.M. Martinac & Co.; Caterpillar Tractor Co.; Southwest
Marine Hardware, Inc., Defendants.
SARATOGA FISHING CO., Plaintiff-Appellant,
v.
MARCO SEATTLE INC.; Southwest Marine Hardware, Inc.;
Caterpillar Tractor Co.; J.M. Martinac & Co.,
Defendants-Appellees.
SARATOGA FISHING CO., Plaintiff-Appellee,
v.
J.M. MARTINAC & CO., Defendant-Appellant.
 Nos. 93-56344, 93-56368 and 93-56501.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 8, 1995.
Filed April 25, 1995.
Withdrawn Aug. 4, 1995.
Filed Aug. 4, 1995.
Withdrawn Oct. 26, 1995.
Decided Oct. 26, 1995.
 
 Daniel B. MacLeod, Alford & MacLeod, San Diego, California, for defendant-appellant-cross-appellee Marco Seattle, Inc.
 Duncan B. Koler, Walton, Ottesen, Meads & Koler, San Diego, California, for defendant-appellant-cross-appellee J.M. Martinac & Company.
 Keith Zakarin, Pillsbury, Madison & Sutro, San Diego, California, for plaintiff-appellee-cross-appellant Saratoga Fishing Company.
 Appeals from the United States District Court for the Southern District of California.
 Before: BEEZER and JOHN T. NOONAN, Jr., Circuit Judges, and EZRA, District Judge.*
 Opinion by Judge BEEZER; Partial Concurrence and Partial Dissent by Judge NOONAN.
 ORDER
 The opinion filed August 4, 1995, appearing at 63 F.3d 792 (1995), is hereby withdrawn.OPINION
 BEEZER, Circuit Judge:
 
 
 1
 This products liability action in admiralty arose following an engine room fire that caused the flooding and sinking of the fishing vessel M/V SARATOGA. The district court concluded that J.M. Martinac & Company ("Martinac"), the shipbuilder, and Marco Seattle, Inc. ("Marco"), the designer of the vessel's hydraulic system, were strictly liable to Saratoga Fishing Company ("Saratoga Fishing"), the vessel owner, for damages to "other property" on the vessel because the fire and subsequent loss resulted from a defectively designed hydraulic system. The district court reduced the damages award by two-thirds, however, because of Saratoga Fishing's comparative fault in maintaining and operating that system. Both sides appeal the district court's determinations on liability and damages.[1]
 
 
 2
 We have jurisdiction over these timely appeals pursuant to 28 U.S.C. Sec. 1291. Because we agree with all but one facet of the district court's resolution of this action, we affirm in part, reverse in part and remand.
 
 
 3
 * We retrace the fateful path of the fishing vessel M/V SARATOGA ("SARATOGA"). The vessel was designed and built in 1971 by Martinac in its Tacoma, Washington shipyards for Joseph Madruga. During the construction process, Martinac, after consulting with Madruga, contracted with Marco to design a hydraulic system. The system was installed by Martinac and inspected by Marco.
 
 
 4
 The SARATOGA's hydraulic system included pumps, pump drives, control valves, hoses and pressure gauges all connected to a 190-horsepower Caterpillar D333 engine and turbocharger. The system operated machinery and equipment such as a power block, a boom and winches, which were necessary to use the seine (net) for tuna fishing operations. Hydraulic fluid was pumped through the system to operate the deck machinery. The fluid exited the pumps through five rubber hoses attached to the pump drive by metal couplings. The hoses rose vertically from the pump to the overhead, passing near the engine and turbocharger.
 
 
 5
 The completed vessel was launched in 1972. Its captain, Manuel Vargas, took the vessel from San Diego, where it had undergone various sea trials, to Panama where she was outfitted with a seine and other fishing equipment. The SARATOGA then commenced tuna fishing operations.
 
 
 6
 In 1974, the Manuel S. Vargas, Jr. Corporation, which was principally owned by Vargas and later changed its name to Saratoga Fishing, purchased the SARATOGA from Madruga. At the time of sale, the vessel was equipped with five speedboats, a purse skiff, a seine, and various electronic equipment. Vargas continued to serve as captain until 1979.
 
 
 7
 When Vargas returned to the SARATOGA as captain in 1984, the condition of the vessel had deteriorated. While overseeing a refurbishing of the vessel, Vargas ordered a series of modifications to various machinery and equipment: the size of the seine was increased; a larger boom was installed; a larger power block was installed; larger cartridges were installed in the pumps; and a 100-horsepower electric drive and pump were installed to increase power to the hydraulic system above that of the original equipment.
 
 
 8
 A new Chief Engineer joined the vessel in 1984. Wesley Ogilvie noticed on his first fishing trip that the hydraulic system was experiencing failures, such as leaking valves and breaking hoses. Nevertheless, Captain Vargas continued to seek increased power to the hydraulic system to quicken the speed at which the seine could be pursed. Assistant Engineer Lewis Jorge joined the crew in 1985, and observed worn out pump cartridges and an overloaded hydraulic system. In late 1985, Ogilvie was replaced as Chief Engineer by Mark Nielson, who noticed more problems with the hydraulic system. Hydraulic hoses needed replacement, winches were leaking hydraulic fluid, and the temperature of the hydraulic fluid was abnormally high.
 
 
 9
 Various repair work was completed on the SARATOGA when she docked in Panama late in 1985, including the replacement of seals in the hydraulic system and pump cartridges. Workers also repaired damage to the turbocharger on the main engine. On January 8, 1986, the SARATOGA departed Panama to fish for tuna near the Gallapagos Islands in the Pacific Ocean.
 
 
 10
 On the afternoon of January 16, Chief Engineer Nielson observed one hydraulic hose seeping hydraulic fluid at the coupling attaching the hose to the pump. Although Captain Vargas arranged to rendezvous with another vessel to obtain a necessary tool to manufacture a replacement hose, Vargas did not shut down the hydraulic system. Instead, Vargas utilized the system to catch more tuna late that afternoon.
 
 
 11
 A short time later, Lewis Jorge entered the engine room and observed that a hydraulic hose was "pulsating." As Jorge watched, the hose pulled out of its coupling and hydraulic fluid sprayed up from the coupling and fell back onto the hot surface of the turbocharger. The fluid ignited causing an immediate conflagration in the engine room. Jorge and Nielson attempted to extinguish the fire, but their efforts were unsuccessful.
 
 
 12
 The fire quickly spread throughout the SARATOGA, and Captain Vargas ordered the crew to abandon ship. The crew left in a skiff, and were soon rescued by another vessel. No crew member suffered serious injury. Unfortunately, the SARATOGA sank.[2]
 
 
 13
 Property losses included, in addition to the loss of the vessel, all of the fishing equipment, fuel, a substantial tuna catch stored in the vessel, crew members' personal property losses, and $16,000 in cash that Captain Vargas had placed in the vessel's safe.
 
 
 14
 Saratoga Fishing brought the instant lawsuit in district court against Martinac and Marco within the court's admiralty jurisdiction seeking recovery for property losses. See 28 U.S.C. Sec. 1333. The court conducted a 14-day trial in which it heard testimony from a variety of expert witnesses and considered a substantial amount of evidence.
 
 
 15
 At trial, Saratoga Fishing argued that the hydraulic system was defectively designed. It sought recovery under theories of strict liability, negligence, and failure to warn.
 
 
 16
 Saratoga Fishing offered, among other witnesses, the expert testimony of David Saveker, a naval architect. Saveker testified that the Marco hydraulic drive system incorporated an unsafe design. The hydraulic hoses were, in Saveker's opinion, located too close to the hot surfaces of the engine and turbocharger. As hydraulic hoses and couplings are prone to fail for a variety of reasons, Saveker noted, the designer of the hydraulic system should have taken preventive measures such as relocating the hoses elsewhere, installing an electric instead of a diesel motor to reduce the risk of a fire developing from leaking hydraulic fluid, or isolating the hoses from the engine and turbocharger by the use of shielding. Such shielding would have "screen[ed] out a large percentage of the probability of an immediate torch" from the leaking hydraulic fluid. Saveker testified that the system was "a bad accident waiting to happen."
 
 
 17
 Marco and Martinac argued that the vessel's design was not defective, that Saratoga Fishing had failed to maintain the fire suppression system or the hydraulic hoses, and that Saratoga Fishing had substantially altered and misused the hydraulic system.
 
 
 18
 Larry Grief, a marine architect, testified as an expert witness for Marco and Martinac. He stated that the hydraulic system on board the SARATOGA met well-established marine practice and was similar to those on almost every vessel he had been aboard. The hydraulic hoses, Grief noted, were designed with a safety margin of 6 to 1 over standard operating pressures. In Grief's opinion, the hydraulic system was not operating properly because of the modifications made by Saratoga Fishing. The addition of a 100-horsepower electric drive caused the hydraulic fluid to pass through the system at a higher velocity, leading to a corresponding increase in the temperature of the hydraulic fluid, which in turn caused rapid deterioration. Furthermore, the larger equipment (seine, boom, and power block) installed by Saratoga Fishing required more hydraulic power, but the installation was not accompanied by any modifications in the hydraulic hoses.
 
 
 19
 The district court concluded that Marco and Martinac were strictly liable for the loss of the SARATOGA. The court found that the hydraulic system was defectively designed despite the fact that it met established marine practices. The placement of the hydraulic hoses in close proximity to the engine and turbocharger presented a known serious risk of fire and, the district court found, feasible design changes, such as the placement of a shield or barrier to isolate the hydraulic hoses from the engine and turbocharger, would have reduced the risk. The modifications made by Saratoga Fishing did not alter the chain of causation because they did not affect the design.
 
 
 20
 The court also found, however, that Saratoga Fishing was at fault due to its poor maintenance of the hydraulic system, its overuse of the system, and its failure to recognize the signs of imminent failure of the system. Saratoga Fishing's comparative fault reduced its recovery by two-thirds.
 
 
 21
 In a later ruling, the district court awarded damages to Saratoga Fishing in the amount of $452,326, one-third of the sum it determined to be Saratoga Fishing's total damages. The award included losses of the tuna catch, seine, skiff, fuel, equipment, the crews' personal losses, the cost of the rescue, and Captain Vargas' cash.
 
 
 22
 Not included in the award was the loss of any replacement parts that Saratoga Fishing installed on the vessel. The award also did not include the loss of the vessel's hull, which the trial court had decided pretrial was not recoverable from either defendant in an admiralty products liability action.
 
 
 23
 The court awarded prejudgment interest, which raised the total award to Saratoga Fishing to $734,940.38. Finally, the court awarded additional interest to Saratoga Fishing until the date of the final judgment at the rate of $153.09 per day.
 
 II
 
 24
 We review the admiralty trial court's findings of fact for clear error, and its conclusions of law de novo. Havens v. F/T Polar Mist, 996 F.2d 215, 217 (9th Cir.1993). The existence and extent of a duty are questions of law reviewed de novo, while proximate cause and whether such a duty has been breached are questions of fact reviewed for clear error. Martinez v. Korea Shipping Corp., Ltd., 903 F.2d 606, 609 (9th Cir.1990).
 
 
 25
 We review de novo the legal conclusion that damages are available. United States v. Timberland Paving & Constr. Co., 745 F.2d 595, 599 (9th Cir.1984) ("[w]e review questions of law de novo"). Finally, we review for clear error a trial court's factual findings in support of an award for damages. Bergen v. F/V St. Patrick, 816 F.2d 1345, 1347 (9th Cir.1987), cert. denied, 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989).
 
 III
 
 26
 Saratoga's claims fall within the admiralty jurisdiction, as they arose on the high seas. 28 U.S.C. Sec. 1333; see Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., --- U.S. ----, ----, 115 S.Ct. 1043, 1047, 130 L.Ed.2d 1024 (1995). We apply, as the district court did, substantive admiralty law, which, absent a federal statute, is the general maritime law. East River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 864, 106 S.Ct. 2295, 2298-99, 90 L.Ed.2d 865 (1986). The law of products liability, including strict liability, is recognized as part of the general maritime law. Id. at 865, 106 S.Ct. at 2299; Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co., 565 F.2d 1129, 1135 (9th Cir.1977).
 
 
 27
 In holding that a strict products liability action would lie in admiralty, we adopted the Restatement (Second) of Torts Sec. 402A (1965) as "the law of products liability in this circuit" because it was "the best and most widely-accepted expression of the theory of strict products liability." Pan-Alaska, 565 F.2d at 1135. Section 402A provides as follows:
 
 
 28
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 
 
 29
 (a) the seller is engaged in the business of selling such a product, and
 
 
 30
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 
 
 31
 (2) The rule stated in Subsection (1) applies although
 
 
 32
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 
 
 33
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 
 
 34
 Under the doctrine of strict products liability, manufacturers and sellers of products are held liable because society considers them better able than individuals to bear the costs of injuries and damage resulting from defective products. See W. Page Keeton et al., Prosser and Keeton on Torts Sec. 98, at 692-93 (5th ed. 1984) [hereinafter Prosser & Keeton] (manufacturers and sellers "have the capacity to distribute the losses of the few among the many who purchase the products"); Greenman v. Yuba Power Prods., Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963); Thomas J. Schoenbaum, Admiralty and Maritime Law Sec. 5-6, at 177 (1994) (policies underlying strict liability apply in admiralty).
 
 
 35
 * Martinac and Marco argue, based on two theories, that the district court erred in concluding that they owed any duty to Saratoga Fishing. They contend first that Saratoga Fishing was a sophisticated commercial buyer and that imposition of a strict products liability duty in this context is unwarranted. Next, Martinac and Marco argue that Saratoga Fishing failed to establish that the vessel, specifically the hydraulic system, was without substantial change. Thus, they contend that under Restatement section 402A(1)(b), they had no duty to protect Saratoga Fishing from a defective condition unreasonably dangerous to it.[3]
 
 
 36
 Marco and Martinac raise interesting policy arguments for why commercial sellers should not owe a strict products liability duty to sophisticated commercial buyers of products such as fishing vessels. Many of the concerns animating strict products liability, including the ability of manufacturers and sellers to better absorb the costs of defective products, do not necessarily support strict products liability in this context. Indeed, private insurance on the part of the vessel's owner would, it is argued, provide a more effective economic allocation of risk. We have also recognized that section 402A of the Restatement "should be applied only when the purposes it seeks to serve dictate its application." McKay v. Rockwell Int'l Corp, 704 F.2d 444, 447 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984).
 
 
 37
 The question is not, however, an open one in this circuit. We have held a commercial seller of a maritime product strictly liable under Restatement section 402A in a factually similar case involving a presumably sophisticated commercial buyer. Pan-Alaska, 565 F.2d at 1134-37; see also East River, 476 U.S. 858, 864-66, 871, 106 S.Ct. 2295, 2298-2300, 2302, 90 L.Ed.2d 865 (discussing application of strict products liability to "manufacturer in a commercial relationship"). Although we have not specifically considered the policy arguments raised here, we have yet to create an exception to strict products liability for certain sellers based on the commercial nature of the sale.[4] See Paul N. Wonacott, Products Liabilities of Shipbuilders and Repairers, 62 Tulane L.Rev. 465, 469 (1988) (liability for a defective product under section 402A attaches in admiralty regardless whether "the accident-causing product is a structure uniquely designed to a particular owner's specifications"). Because many maritime transactions occur between commercial sellers and sophisticated buyers, the position advocated by Marco and Martinac would tend to eliminate what we have already accepted--that strict products liability is a part of the general maritime law.
 
 
 38
 Marco and Martinac's other argument regarding strict products liability duty is also unavailing. They misperceive the meaning of "substantial change" as defined by section 402A(1)(b). The Restatement section 402A provides that the product must "reach the user or consumer without substantial change in the condition in which it is sold." Thus, if a manufacturer's product is altered by a seller or other intermediary, the manufacturer might be immune from strict liability. See Restatement Sec. 402A cmt. p. Once the product has reached the "user or consumer," however, that element has been satisfied. See Emerson G.M. Diesel, Inc. v. Alaskan Enter., 732 F.2d 1468, 1475 (9th Cir.1984) (product must not be "altered or changed when it reached the consumer"), overruled in part on other grounds by East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).
 
 
 39
 Any misuse or fault by the user or consumer could and indeed, in this case, did reduce the plaintiff's recovery. Restatement Sec. 402A cmt. n; Pan-Alaska, 565 F.2d at 1138 (comparative fault concepts can be applied to strict products liability). Whether the plaintiff misused the product, or significantly altered the product so as to become an intervening, superseding proximate cause of the resulting loss may even relieve the manufacturer or seller from liability altogether, but that misuse or alteration does not relate to whether the manufacturer or seller had a duty to the consumer or user. The duty exists if the product was in a defective condition at the time the consumer or user obtained the product. Because the hydraulic system retained the same design when Saratoga Fishing acquired the product from Madruga in 1974 as it did when Marco and Martinac installed the system, Marco and Martinac owe a duty to Saratoga Fishing regarding any design defect.
 
 
 40
 In any case, the alterations made to the hydraulic system by Saratoga Fishing did not substantially alter the design of the system, which is what the district court found to be defective. The design of the system was the same on the day of the vessel's loss as it was when the SARATOGA left the shipyard.
 
 B
 
 41
 Martinac and Marco argue that the district court erred in finding the design of the hydraulic system to be defective. They contend that the district court improperly applied a risk-utility test instead of a consumer or user expectations test to determine if the hydraulic system was defectively designed. Finally, Marco and Martinac argue, the district court misapplied the risk-utility test. We disagree with each of these contentions.
 
 
 42
 Admiralty courts use two methods to determine whether a product is defectively designed. The first method, drawn from Restatement section 402A comment i, provides that a product is defective if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." This is the consumer expectations test. See Wonacott, Shipbuilder Liability, at 469; Prosser & Keeton Sec. 99, at 698.
 
 
 43
 Although utilized by many courts, this test has come under criticism because of several shortcomings. First, it allows a manufacturer or seller to escape liability when the unreasonable danger is open and obvious. See Prosser & Keeton Sec. 99, at 698-99; M. Stuart Madden, Products Liability Sec. 6.7, at 213-14 (1988). Second, it is unpredictable in application. See Prosser & Keeton Sec. 99, at 699. Because of the weaknesses of this test, some courts have sought an alternative way to determine whether a product was defectively designed.
 
 
 44
 A second test evolved from Judge Learned Hand's balancing test in a negligence case, United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir.1947). The risk-utility balancing test, in the context of a strict products liability action, weighs the utility of the product against the gravity of the danger. If, after considering the utility of the product, the economic and practical feasibility of alternative designs, and the gravity and likelihood of the potential harm, the factfinder determines that the risk outweighs the utility, the product is deemed defective or unreasonably dangerous.[5] See Pavlides v. Galveston Yacht Basin, Inc., 727 F.2d 330, 337 (5th Cir.1984) (applying risk-utility test in admiralty case); Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1078 (5th Cir.1973) (nonadmiralty case), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); Wonacott, Shipbuilder Liability, at 469; Prosser & Keeton Sec. 99, at 699-700.
 
 
 45
 A recent law review article noted that "[a]dmiralty decisions reveal that no predictable fact pattern or particular liability theory will dictate application of any one test; so it is not believed possible to identify a consistently preferred admiralty standard." Wonacott, Shipbuilder Liability, at 471. The language of section 402A neither compels nor precludes the application of either test; it merely provides for an examination of whether a product is unreasonably dangerous.
 
 
 46
 We have not indicated which test or tests should be applied in admiralty cases in this circuit.[6] The district court rejected the pure application of the "so-called consumer's expectations" test in comments g and i of Restatement section 402A. Instead, the court applied the risk-utility test, citing the Fifth Circuit's decision in Pavlides. The district court proceeded to examine the risk and utility of the design along with the feasibility of alternative designs.
 
 
 47
 We agree with the district court regarding the appropriateness of applying the risk-utility test in this case. If the consumer expectations test had been applied, the danger posed by the placement of the hoses of the hydraulic system in close proximity to the hot engine and turbocharger surfaces would likely be deemed open and obvious, especially to a purchaser or user of a fishing vessel. We are not satisfied with the possibility that a product with a design having high risk and limited utility, and a design that has other feasible alternatives, could be found not to be unreasonably dangerous or defective merely because a consumer, using the product in a foreseeable way, could recognize the danger.[7] As the district court correctly recognized, the risk-utility test provides a superior yardstick of whether a product is unreasonably dangerous or defective.
 
 
 48
 We note that a preliminary draft of the Restatement (Third) of Torts by the reporters for the American Law Institute relies on a risk-utility analysis for deciding design defect cases. See Restatement (Third) of Torts: Products Liability Sec. 2 (Tentative Draft No. 1, 1994). The tentative draft divides defective product cases into three categories: manufacturing defect cases, design defect cases, and inadequate warning cases. Proposed section 2(b) provides that "[a] product is defective in design when the foreseeable risks of harm posed by the product could have been reduced by the adoption of a reasonable alternative design by the seller ... and the omission of the alternative design renders the product not reasonably safe." Id. Sec. 2(b). Under the proposed Restatement, the consumer expectations test no longer "constitute[s] an independent standard for judging the defectiveness of product designs." Id. Sec. 2(b) cmt. e. Instead, the focus is on the reasonableness of the design and the plaintiff's ability to prove that a reasonable alternative design would have reduced foreseeable risks of harm. Id. Sec. 2(b) cmt. c. Although we need not, and do not, adopt the formulation of the Restatement (Third) at this time, it provides support for our holding that a focus on the design's benefits, risks, and feasible alternatives is a better approach to examining an alleged design defect. See id. Sec. 2(b) cmt. c, reporters' note at 41 ("[s]cholarly commentary agrees overwhelmingly with ... the risk-utility approach.").
 
 
 49
 Our approval of an application of the risk-utility test in this case does not necessarily preclude future admiralty plaintiffs from showing a design defect using the consumer expectations test. In Pan-Alaska, we adopted the Restatement Sec. 402A as the law of this circuit. That section includes comment i, which allows a consumer to show that a product was unreasonably dangerous in a way not contemplated by the consumer. Other jurisdictions permit a plaintiff to show a product design defect under either approach. See, e.g., Barker v. Lull Engineering Co., 20 Cal.3d 413, 432, 143 Cal.Rptr. 225, 573 P.2d 443 (1978); Caterpillar Tractor Co. v. Beck, 593 P.2d 871, 884 (Alaska 1979). Given our traditional discretion in admiralty, see East River, 476 U.S. at 871, 106 S.Ct. at 2302, we conclude that giving plaintiffs such a choice is appropriate.
 
 
 50
 Marco and Martinac next maintain that the district court improperly applied the risk-utility test because it failed to balance the various factors and failed to find that a feasible alternative design would have prevented the fire. Marco and Martinac also argue that the district court erred in finding the design unreasonably dangerous. We disagree.
 
 
 51
 The district court examined the risk from the design of the hydraulic system, and found it extremely high. Saratoga Fishing presented evidence that hydraulic hoses can fail for a variety of reasons and that any failure under the currently designed system would lead to a serious fire. The district court considered the utility of the current design, but was persuaded that an alternative design, namely a metal shield placed to isolate the hot surfaces of the engine and turbocharger from the hydraulic hoses, would have led to less "harmful consequences."
 
 
 52
 The district court did not rely on the mere technical possibility of a safer design. See Glover v. BIC Corp., 987 F.2d 1410, 1422-23 (9th Cir.), amended, 6 F.3d 1318 (9th Cir.1993). Rather, Saratoga Fishing presented evidence regarding specific feasible improvements in design. Indeed, Mr. Martinac himself testified that Martinac "now puts up a sheet metal barrier" in vessels. A barrier could have isolated the hydraulic hoses from the turbocharger and engine surfaces, while maintaining the utility of the system. Although the district court found that Marco and Martinac's failure to use such a shield at the time of construction did not violate any industry rules or standards, it found the design unreasonably dangerous and defective because the design included a high risk of danger and there was a feasible alternative.
 
 
 53
 Many qualified experts testified on both sides regarding the efficacy of the hydraulic system's design and the feasibility and safety of other designs. The parties disagree on whose experts and evidence deserve credence, as the experts disagreed on many critical issues, including whether the design was defective. We must accord due deference to the district court's consideration of the experts' testimony and the court's findings regarding that testimony. Anderson v. City of Bessemer City, 470 U.S. 564, 573-75, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985) (citing Fed.R.Civ.P. 52(a)) ("[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). The district court correctly applied the risk-utility test in finding the design of the hydraulic system defective. Its findings are not clearly erroneous.[8]
 
 C
 
 54
 Marco and Martinac argue that the district court erred in finding that Saratoga Fishing's misuse and alteration of the hydraulic system was not a superseding cause of the accident and subsequent loss of the vessel. Again, we disagree.
 
 
 55
 Any design defect must be shown to have contributed to, or caused the accident that led to the injury. Matthews v. Hyster Co., 854 F.2d 1166, 1168 (9th Cir.1988); Prosser & Keeton Sec. 102, at 710-11 ("product defect under strict liability must be a proximate cause of claimant's injury"). Here, the presence of the hydraulic hoses near the hot engine and turbocharger surfaces without any effective shield was undoubtedly a proximate cause of and contributed to the fire that resulted in the vessel's loss. The district court found that this was the case, and this finding is not clearly erroneous.
 
 
 56
 Notwithstanding the existence of proximate cause, a manufacturer of a defective product can still be relieved of liability if some unforeseeable misuse or alteration occurred rising to the level of a superseding cause. Prosser & Keeton Sec. 102, at 711. Marco and Martinac argue that such unforeseeable conduct occurred here.
 
 
 57
 They initially rely on a district court finding where the court purportedly stated that Saratoga Fishing's actions were a "precipitating cause" of the vessel's loss. Although the district court did make this finding, Marco and Martinac take it out of context. The court actually found that Saratoga Fishing's poor maintenance, misuse, and modifications to the hydraulic system "all contributed in some part to cause and bring about the catastrophic fire which ignited in the upper engine room ... and was the precipitating cause of the vessel's loss...." As this longer excerpt reveals, the court found that the fire was the precipitating cause of the loss. This is, of course, obvious. The court did not find that Saratoga Fishing's actions were a precipitating cause of the fire, rather it found that they were a contributing, or "substantial cause[ ]" of the fire.
 
 
 58
 The district court did not find that Saratoga Fishing's misuse and alteration of the hydraulic system amounted to a superseding cause of the accident. The district court could have, but did not, find Saratoga Fishing's misuse to be unforeseeable.[9] Cf. Kay v. Cessna Aircraft Co., 548 F.2d 1370, 1372-73 (9th Cir.1977) (plaintiff may recover if product is used in foreseeable, even if unintended use). The district court instead decided that hydraulic hose failure through either misuse, poor maintenance, or other conduct was foreseeable to Marco and Martinac, and that it would operate to reduce Saratoga Fishing's recovery but not to supersede Marco and Martinac's design defect as a proximate cause of the loss. This finding was not clearly erroneous.
 
 
 59
 Marco and Martinac point to the alterations in the hydraulic system as examples that the system was modified substantially. The modifications, however, did not alter the design to the point where they superseded the design as a proximate cause of the fire.
 
 D
 
 60
 Saratoga Fishing argues that the district court erred in reducing its award of damages by two-thirds based on the court's findings that it was also at fault for altering, misusing, failing to properly maintain, and ignoring the imminent failure of the hydraulic system. We agree with the district court.
 
 
 61
 We have held that the concepts of "comparative fault (i.e., contributory negligence) ... can be applied to the doctrine of strict products liability." Pan-Alaska, 565 F.2d at 1138. Under comparative fault principles, a party's blameworthy conduct that contributes to the proximate cause of the loss or injury will be compared to the defendant's liability and act to reduce the plaintiff's award of damages. Id. at 1139-40. As we stated: "It comes down to this: the defendant is strictly liable for the harm caused from his defective product, except that the award of damages shall be reduced in proportion to the plaintiff's contribution to his own loss or injury." Id. at 1139.
 
 
 62
 The district court found that Captain Vargas failed to properly maintain the hydraulic system. In an effort to increase the speed and power of the system, Vargas authorized enlarging the size of the seine, increasing the size of the power block, and increasing the velocity of the hydraulic flow and power to the machinery and equipment. This increased velocity raised the temperature of the hydraulic fluid and resulted in increased deterioration of the component parts of the hydraulic system, including the hydraulic hoses.
 
 
 63
 The district court also found that the engineers on board informed Captain Vargas that the hydraulic system was "overworked, wearing out and prone to an increasing number of failures." Vargas nonetheless continued to operate the system in excess of design pressures and temperatures and deferred remedial measures. Most significantly, the district court found that on January 16, the hydraulic hose that eventually failed was observed by the Chief Engineer and his assistant to be "leaking or weeping at the coupling."[10] Despite being informed of the problem with the hose, Captain Vargas continued to operate the hydraulic system. The district court found that this created an "unreasonable risk that the hose would fail," causing hydraulic fluid to come in contact with the surface of the engine.
 
 
 64
 The poor maintenance of the system, the modifications to the system, and the use of the system known to have a defective hose all contributed to the fire that caused the sinking of the vessel. The district court found that the conduct of those who manned the SARATOGA "border[ed] on irresponsible." The district judge is in the best position to weigh the evidence and apportion fault. Alkmeon Naviera, S.A. v. M/V Marina L, 633 F.2d 789, 796 (9th Cir.1980). The district court's determination is not clearly erroneous and the apportionment of two-thirds liability to Saratoga Fishing will not be disturbed.
 
 
 65
 Saratoga Fishing next argues that Marco and Martinac failed to establish the standard of care of a prudent tuna boat operator. We reject this argument. Marco and Martinac presented substantial evidence concerning proper maintenance and care of a fishing vessel's hydraulic system. That is more than sufficient to establish a standard of care.
 
 IV
 
 66
 We next address the subject of damages. The district court awarded Saratoga Fishing $452,326, which sum equals one-third of the combined value of the following items: the tuna catch, net, skiff, fuel, assorted equipment, crew losses, rescue costs, and cash. The district court declined to award damages for the value of replacement parts and the vessel's hull. Marco, Martinac, and Saratoga Fishing raise various objections to the award. With one exception, we reject each of the arguments and agree with the district court's determinations.
 
 
 67
 In East River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Supreme Court recognized a significant limitation to its decision to adopt the law of strict products liability to admiralty. The Court drew a distinction between damage caused to the "product itself" and damage to a "person or other property." Id. at 870, 106 S.Ct. at 2301-02. When the product itself is damaged, the "resulting loss is purely economic" and losses such as "repair costs, decreased value, and lost profits ... essentially [involve] the failure of the purchaser to receive the benefit of its bargain--traditionally the core concern of contract law." Id. At least in the commercial context, the Court stated that damage to a product should be sought by plaintiffs through a contract or warranty claim. A cause of action for damages in a products liability claim in admiralty is available only for an injury to persons or "other property." Id.
 
 
 68
 We have not yet had the opportunity to further define the contours of "other property." The Fifth Circuit has developed some principles in this area. In Shipco 2295, Inc. v. Avondale Shipyards, Inc., 825 F.2d 925 (5th Cir.1987), the Fifth Circuit was faced with the question whether the "product" consisted of a finished vessel or individual components that were included in the vessel. That court focused on the perspective of the buyer of the vessel, and held that the finished vessel that was the "object of the contract must be considered 'the product' rather than the individual components that make up the vessel[ ]." Id. at 928. The Fifth Circuit added that "the product in this context means the finished product bargained for by the buyer rather than components furnished by a supplier." Id. at 930.
 
 
 69
 * We are faced here with a slightly different situation. The vessel that Martinac sold to Madruga constituted the "product" as far as Madruga was concerned. We must decide whether the "product" changed when Madruga added various components, including a skiff, seine and other miscellaneous parts, to the vessel and resold it to Saratoga Fishing.
 
 
 70
 We are guided by the policies set forth in East River, where the Court stated that the focus of the product should be on the failure of the purchaser to receive the benefit of its bargain. Warranty and contract law are appropriate for this type of situation. Here, the purchaser is Saratoga Fishing and the object of its bargain was the M/V SARATOGA with the components already installed. Saratoga Fishing purchased the vessel "as is." Madruga made no "warranty or representation of vessel condition."
 
 
 71
 The Fifth Circuit's decision in Nicor Supply Ships Assoc. v. General Motors, 876 F.2d 501 (5th Cir.1989) is not in conflict with this principle. In that case, the vessel was sold only once. The buyer then time-chartered the vessel to a third-party, who installed equipment on the vessel. The court properly focused on the bargain between the buyer and shipbuilder to determine what was the product. Id. at 505-06. The equipment was deemed "other property."
 
 
 72
 East River provides a situation more similar to the one we confront here. In that case, the shipbuilder sold the vessel to a purchaser who subsequently executed an agreement with a bareboat charterer. The charterer took the vessel in an "as is" condition and assumed full responsibility for the vessel including maintenance, repair and insurance. 476 U.S. at 875, 106 S.Ct. at 2304. The Supreme Court focused on the terms of "the charterers' agreements with the owners." Id. The Court also noted that the "contractual responsibilities thus were clearly laid out. There is no reason to extricate the parties from their bargain." Id. The contract being discussed is that between the first buyer and the bareboat charterer, who the Court treated as equivalent to a second buyer.
 
 
 73
 Saratoga Fishing is the second buyer in this case. We must therefore focus on its agreement with Madruga. We see no reason to extricate Saratoga Fishing from its bargain. The parties chose not to include a seller's warranty, and we will not second guess their choice. The "product" in this case is the vessel that was delivered to Saratoga Fishing. Because it included the skiff, net, fuel, spare parts, and miscellaneous equipment, those items are part of the product and are not recoverable in a tort action as "other property."
 
 
 74
 It would indeed be anomalous for the shipbuilder's liability to increase every time the vessel was modified and resold. We agree with Marco and Martinac that such a result is inconsistent with East River and with the policies behind the application of products liability law to admiralty. The district court's award of damages to Saratoga Fishing for the skiff, net, fuel, spare parts, and miscellaneous equipment installed on the SARATOGA when it was sold to Saratoga Fishing is reversed.
 
 
 75
 Marco and Martinac next argue that an award of damages for the tuna catch was unjustified. They contend that the lost catch was a nonrecoverable pure economic loss under various theories: first, because the lost catch was a work in progress; second, because the lost catch was equivalent to damaged cargo; and third because it was similar to failed or damaged crops. We disagree.
 
 
 76
 The tuna catch that was destroyed was different than cargo because it was not being shipped from one site to another pursuant to a commercial agreement. It was new property on board the SARATOGA that belonged to the vessel's owner. The tuna was also not a work in progress as it had substantial value after being caught. The district court correctly reduced the value of the tuna by accounting for fuel costs and Panama Canal toll charges, and accurately computed the value of the tuna lying in the holds of the SARATOGA. Finally, the cases involving damaged crops are agricultural cases and are not helpful in the context of admiralty. We conclude that the tuna catch was not an economic loss, but was a loss of other property. The district court did not abuse its discretion in awarding damages for the tuna catch.
 
 
 77
 Marco and Martinac lastly contend that the district court erred in awarding Saratoga Fishing the value of Captain Vargas' lost currency because it was duplicative of sums awarded under the category of the lost crew property. The district court found that Vargas' testimony was "not effectively refuted" and was "credible." Marco and Martinac have shown insufficient evidence that the district court's findings were clearly erroneous. We will not disturb them.
 
 B
 
 78
 Saratoga Fishing appeals the district court's refusal to award the value of replacement equipment installed in the vessel. It also argues that the district court erred in not permitting it to include the value of the vessel's hull in its damages sought from Marco.
 
 
 79
 The district court concluded that replacement parts should not be recoverable as "other property" under East River. The court stated that permitting recovery would lead to the absurd result that the shipbuilder's liability would grow as the performance of the product's relationship to the shipbuilder decreased. We agree. Because a product may have any number of components replaced with spare parts in the ordinary course of events, viewing these parts as "other property" would lead to absurd results. Such results would be contrary to the policies of East River, where the Supreme Court expressed its intention to exclude damages to the product itself from tort law and leave the injured party to remedies in the law of contract and warranty. 476 U.S. at 871-72, 106 S.Ct. at 2302-03; see Exxon Shipping Co. v. Pacific Resources, Inc., 835 F.Supp. 1195, 1200 (D.Haw.1993) (prohibiting recovery of cost of replacement parts in admiralty products liability action).
 
 
 80
 Saratoga Fishing lastly seeks damages from Marco (not Martinac) for the loss of the vessel itself. This argument is based on two propositions: first, that the approach to damages in East River should not apply to fishermen; and second, that for a component manufacturer such as Marco, the only "product" is its hydraulic system and that the vessel is "other property." Neither argument has merit.
 
 
 81
 Saratoga Fishing relies on footnote 5 in East River, in which the Supreme Court observed that it had at times applied a more protective approach in some admiralty contexts for fishermen, and that no fishermen were involved in that case. Even if that footnote reflected an exception to the rules set forth in East River, it is not applicable here. Saratoga Fishing is a company that owned an ocean-going tuna fishing vessel; there are no individual fishermen involved in this litigation. In any case, the only court that has considered the effect, if any, of the footnote, applied the East River damages rules without exception to a case involving plaintiffs who were fishermen. McConnell v. Caterpillar Tractor Co., 646 F.Supp. 1520, 1525 (D.N.J.1986).
 
 
 82
 Also without merit is Saratoga Fishing's argument that the vessel should be deemed "other property" relative to Marco because Marco designed a component part of the vessel. The Fifth Circuit has rejected a similar claim. In Shipco 2295, Inc. v. Avondale Shipyards, Inc., 825 F.2d 925, 928 (5th Cir.1987), cert. denied, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988), the Fifth Circuit rejected a damages claim against the designer of a component part, observing that there is "no rational reason to give the buyer greater rights to recover economic losses for a defect in the product because the component is designed, constructed or furnished by someone other than the final manufacturer." Id. at 929.
 
 
 83
 This rationale is sound. Saratoga Fishing bargained for a fishing vessel. That is the product. The hydraulic system is an integral part of the product. Seldom does one company design and build all component parts for an integrated product such as a fishing vessel. Indeed, Saratoga Fishing, as we noted above, bargained with Madruga, not Martinac, for the vessel, so Saratoga Fishing was one step removed from the initial purchase. Even if Madruga had sought recovery for the hull, however, it would make no difference. Permitting recovery from Marco for the vessel's hull would undermine the policy of East River--namely, that contract and warranty law should cover such losses, while tort law should be reserved for "other property."
 
 C
 
 84
 Marco and Martinac argue that the district court erred in awarding prejudgment interest to Saratoga Fishing. They contend that Saratoga Fishing delayed filing a claim for almost two years after the vessel's loss and that Saratoga Fishing further delayed the litigation during a dispute over an attorney's conflict of interest.[11]
 
 
 85
 "In admiralty, prejudgment interest must be granted unless peculiar circumstances justify its denial." McKay v. Rockwell Int'l Corp., 704 F.2d 444, 463 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). The determination of whether peculiar circumstances exist is left to the district court's sound discretion. Id. at 464.
 
 
 86
 Here, the district court concluded that this case was not "sufficiently peculiar or exceptional to justify departure from the general rule." Saratoga Fishing's claim was filed within the statute of limitations; thus, any delay was certainly not peculiar or unusual. The attorney conflict is also not an unusual occurrence. There is insufficient reason to disturb the district court's exercise of its sound discretion in awarding prejudgment interest.
 
 
 87
 Marco and Martinac also object to the district court's purported computation of postjudgment interest as inconsistent with the statutory mandate of 28 U.S.C. Sec. 1961. Saratoga Fishing correctly points out, however, that the district court did not award postjudgment interest. It awarded additional prejudgment interest from the date of the damages findings and conclusions, June 1, 1993, until the date of final judgment, August 27, 1993. We find no error with the decision to award additional prejudgment interest. Of course, in light of our decision reversing part of the damages award, the district court should recompute the entire award of prejudgment interest on remand.
 
 
 88
 Finally, Saratoga Fishing is entitled to a further award of interest pursuant to 28 U.S.C. Sec. 1961 from the date of entry of judgment until payment is made.
 
 V
 
 89
 We are persuaded that the district court, having heard from all the experts and witnesses, did not, with the one aforementioned exception, err in deciding the issues of liability and damages. Marco and Martinac will pay their share because of their defectively designed hydraulic system, but Saratoga Fishing's award will be substantially reduced because of its failure to properly maintain and operate that system.
 
 
 90
 On remand the district court is directed to reconsider the amount of damages and interest and to enter judgment accordingly.
 
 
 91
 AFFIRMED in part, REVERSED in part and REMANDED. Each party shall bear its own costs.
 
 
 92
 NOONAN, Circuit Judge, concurring and dissenting:
 
 
 93
 I concur in the opinion of the court, except as to its exclusion of damages for the skiff, seine net, fuel, spare parts and other miscellaneous equipment sold by Madruga to Saratoga Fishing as part of the sale of the M/V SARATOGA. None of this property was manufactured or sold by Martinac. Under East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864, 106 S.Ct. 2295, 2298-99, 90 L.Ed.2d 865 all of it was "other property," damages for which are recoverable in tort. The court abandons East River and puts this circuit in conflict with another major maritime circuit, Nicor Supply Ships Assoc. v. General Motors, 876 F.2d 501, 505-06 (5th Cir.1989). The opinion also repudiates controlling authority in this circuit, Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co., 565 F.2d 1129 (9th Cir.1977). That case accepted "as the law of products liability in this circuit, at least for this case arising in admiralty," the Restatement (Second) of Torts, Sec. 402A. Id. at 1135. Under the Restatement, the original seller of a product in a defective condition that is unreasonably dangerous that has entered the stream of commerce is strictly liable to the ultimate consumer for physical harm caused to that consumer's property. Saratoga Fishing is here the ultimate consumer; Martinac is the original seller; the property damaged was Saratoga Fishing's and no more a part of the product sold by Martinac than was the tuna catch for which damages are granted.
 
 
 94
 The court appears to have been swayed by the consideration that additions made by a middleman could increase the original seller's liability. That of course is a risk the seller of an unreasonably dangerous, defective product takes. If the explosion had occurred while Madruga still owned the boat after adding the skiff and net, there is no doubt that Martinac would have been liable for those additional items. Martinac's exposure should not decrease because Madruga sold the ship to Saratoga Fishing. Whatever theory one adopts, the liability of the original seller may change as the ultimate consumer adds or subtracts property which can be affected by the defective product. The theory of strict liability holds that the seller is stuck whatever foreseeable damage to the consumer's other property his product causes.
 
 
 
 *
 The Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 Two other defendants, Caterpillar Tractor Company and Southwest Marine Hardware, Inc., are not parties to this appeal
 
 
 [2]
 Although the district court found that the cause of the SARATOGA's sinking was the flooding that occurred as a consequence of the fire, it was unable to determine exactly how and why the flooding occurred. The district court determined that resolving that question was not necessary to its disposition. We agree
 
 
 [3]
 Marco and Martinac also argue that the trial court erroneously found that they had a duty to provide a "safe vessel." We agree that their duty was to provide a vessel that was not unreasonably dangerous to the user. In our judgment, however, the district court's choice of words in one finding does not undermine the propriety of its analysis of the appropriate nature of Marco and Martinac's duty
 
 
 [4]
 In McKay, 704 F.2d at 447 n. 4, we recognized those limited circumstances when strict products liability does not apply. They include unavoidably unsafe products, used products and services. We also added to that list in McKay that only in limited circumstances should a manufacturer be held strictly liable in tort for injuries to a service member in active duty caused by a design defect in military equipment. Id. at 447-48
 
 
 [5]
 In a design defect case, the terms "defective condition" and "unreasonably dangerous" arguably share a common meaning. See Hagans v. Oliver Mach. Co., 576 F.2d 97, 99 n. 4 (5th Cir.1978) (stating that "[a]s used in the Restatement" the two terms are synonymous); see also Carl T. Bogus, Pistols, Politics & Products Liability, 59 U.Cin.L.Rev. 1103, 1107-08 (1991) (arguing that in design defect cases, unreasonable danger is synonymous with defective condition); David P. Griffith, Note, Products Liability--Negligence Presumed: An Evolution, 67 Tex.L.Rev. 851, 859-60, 860 n. 50 (1989) (citing sources supporting proposition that "defective" and "unreasonably dangerous" are synonymous and will lead to the same conclusion in design defect cases). Although we need not hold that the two terms will be synonymous in all cases, we use the terms interchangeably here. In other words, under either the consumer expectations test or the risk-utility test, a product that is deemed unreasonably dangerous will also be deemed to be in a defective condition. Conversely, a product in a defective condition must also be unreasonably dangerous
 
 
 [6]
 Marco and Martinac rely on McCune v. F. Alioto Fish Co., 597 F.2d 1244 (9th Cir.1979) and Complaint of Diehl, 610 F.Supp. 223 (Idaho 1985), to support their argument that only a consumer expectations test should be applied in admiralty. Neither case supports that proposition. McCune merely affirmed, without discussion, a district court's finding that a product was not defective. Diehl, which is a district court decision, did apply a consumer expectations test in the context of an admiralty case, but it did not discuss, and it certainly did not preclude, the applicability of other tests
 
 
 [7]
 Neither party argued that the product in this case was an unavoidably unsafe product. See Restatement Sec. 402A cmt. k
 
 
 [8]
 Although Saratoga Fishing contends that the district court also found Marco and Martinac negligent, the district court's findings and conclusions indicate that the only basis for its holding was strict products liability. The court's mention of negligence in a few places is not sufficient to establish a finding of liability. If the district court did intend to reach a negligence decision, it did not set forth negligence law or make findings regarding that law. Further, it did not address the critical issue in negligence, the fault of the defendant. It addressed only the unreasonably dangerous nature of the product. Thus, any conclusion of negligence is unsupported
 
 
 [9]
 There was some controversy at trial over a water shield that was ostensibly installed over the turbocharger at the time the hydraulic system was installed on the SARATOGA. The district court was unable to determine whether this shield had been removed. It found however, that even if this shield had been in place, it would not have prevented the fire from igniting because it did not adequately cover the surfaces of the turbocharger and engine or isolate the hydraulic hoses from the surfaces. These findings are not clearly erroneous, and thus the presence or absence of the water shield does not affect Martinac and Marco's liability or affect whether Saratoga Fishing's actions constituted a superseding cause of the accident
 
 
 [10]
 Although Chief Engineer Nielson testified that he did not consider the defective hose to be dangerous, the district court found that the engineer must have been aware that it needed replacing and that the hydraulic system should not be operated. The district court also rejected Nielson's testimony that he was unaware of a risk of danger
 
 
 [11]
 Although Marco and Martinac initially objected to an award of prejudgment interest because of the high degree of Saratoga Fishing's comparative fault, they abandoned that ground on appeal