Simons, J.
(dissenting). I agree with the majority that causes of action in strict products liability and breach of implied warranty are not identical. In my view, however, the strict products liability claim is substantively broader than and encompasses the implied warranty claim and, thus, the jury’s verdict of no defect in the products liability cause of action is not reconcilable with its finding of breach of implied warranty. Accordingly, I would answer the first two questions certified to the Court no and yes and find it unnecessary to answer the third question.
I
Liability without fault may be imposed against a manufacturer or supplier of a defective product and in favor of one injured by the product. The product may be defective because it is improperly made, because its design is defective or because the manufacturer’s warnings against foreseeable risks in using it are inadequate. The members of the Court agree that strict products liability and implied warranty are similar in the sense that both causes of action require that, before plaintiff may recover, the product be defective, i.e., there must be something wrong with it. We disagree, however, over how defectiveness is determined. The question does not appear to have been previously addressed by the Court in the context of personal injury litigation.
The majority concludes that the implied warranty and strict products liability causes of action are different because the existence of an actionable defect is determined by two different *265 analyses. Viewing implied warranty from a contract perspective, it would define defectiveness by whether the product lived up to the consumer’s expectations whereas defectiveness, for strict products liability purposes, is determined by application of the risk/utility standard. In my judgment, the consumer expectation standard, appropriate to commercial sales transactions, has no place in personal injury litigation alleging a design defect and may result in imposing absolute liability on marketers of consumers’ products. Whether a product has been defectively designed should be determined in a personal injury action by a risk/utility analysis.
A
Logically, there is no substantive difference for testing liability in the two causes of action. Recovery in each depends upon establishing that the product was defective because improperly designed. But the word "defect” has no clear legal meaning. In this case, the court defined defect in its strict products liability charge but did not attempt to define it otherwise; in the warranty cause of action the meaning had to be found in the court’s instructions describing the nature of the cause of action. Nevertheless, the predicate for recovery in both claims was the same.
The court charged the jury that to recover in strict products liability the plaintiffs had to prove that the Bronco II was "defective” when it was placed on the market. A product is defective, the court said, if it is "not reasonably safe” when used for "its intended or reasonably foreseeable purpose.” That charge was consistent with settled New York law which holds that a manufacturer or supplier may be strictly liable for injuries sustained when a product is used for its intended purpose or for an unintended but reasonably foreseeable purpose (see, Lugo v LTN Toys, 75 NY2d 850, 852; Micallef v Miehle Co., 39 NY2d 376, 385-386; Biss v Tenneco, Inc., 64 AD2d 204, 206). The court charged the jury that to recover for breach of implied warranty the plaintiff was required to establish that the Bronco II was not "reasonably fit for the ordinary purpose for which it was intended.” That instruction is consistent with language found in UCC 2-314 (2) (c).
When these two definitions are compared, it is apparent that a defect for strict products liability purposes is broader than a defect for implied warranty purposes. The vehicle could not have been defective when used for its ordinary and intended purpose (warranty), but not defective and reasonably safe when *266 used for its "intended or for an unintended but reasonably foreseeable purpose” (strict products liability). As the Court of Appeals observed, foreseeable use "certainly includes all uses that are 'ordinary’ [and] perhaps some that are not 'ordinary’ ” (see, Denny v Ford Motor Co., 42 F3d 106, 112). The jury having concluded that the Bronco II was not defective for strict products liability purposes, could not logically conclude that it was defective for warranty purposes.
B
Nor is there any legal reason to distinguish the two causes of action in this respect. Breach of implied warranty and strict liability in tort developed from separate legal doctrines but are not materially different when applied to personal injury claims involving design defects. While breach of implied warranty retains its contractual law characteristics when applied to commercial transactions, it has been consistently recognized that it is a tort when applied to personal injury litigation and that tort principles should apply. To introduce a new test of defectiveness into tort litigation — one based on contract principles — can only destabilize the well-settled law in this area. Both causes of action are torts and defectiveness for both should be determined by the same standard.
The law imposing liability without fault against those making and marketing consumer products evolved in stages, progressing from negligence to implied warranty and eventually to the adoption in New York of a new cause of action known as strict products liability. Implied warranty has been generally associated with the law of contracts (although the Restatement advises us warranty was originally a matter of tort liability), but if implied warranty ever was a contract doctrine, it is now something very different from the warranty cause of action used in commercial transactions (see, Restatement [Second] of Torts § 402 A, comment m; 5 Harper, James and Gray, Torts § 28.27, at 540 [2d ed]; Prosser and Keeton, Torts § 97, at 691 [5th ed]; 1 Weinberger, New York Products Liability § 15:03). Indeed, the idea that there could ever be a claim for breach of implied warranty without privity is a concept entirely foreign to contract law. Moreover, the liability currently imposed in the name of warranty goes far beyond any liability based upon conventional contract notions and encompasses such tort concepts as consequential damages and contributory fault. As Dean Prosser has said: "[T]his warranty, if that is the name for it * * * is something separate and *267 distinct which sounds in tort exclusively, and not at all in contract; which exists apart from any contract between the parties; and which makes for strict liability in tort” (Prosser, Spectacular Change: Products Liability in General, 36 Cleveland Bar Assn J 149, 167-168).
Finally, there can be no doubt about how this Court has viewed the action. We have repeatedly recognized not only that breach of implied warranty when asserted to recover for personal injuries is a tortious wrong (see, Victorson v Bock Laundry Mach. Co., 37 NY2d 395, 402; Velez v Craine & Clark Lbr. Corp., 33 NY2d 117, 124 [converting an action in implied warranty to one for strict products liability]; Codling v Paglia, 32 NY2d 330, 340, quoting Singer v Walker, 39 AD2d 90; Goldberg v Kollsman Instrument Corp., 12 NY2d 432, 436), but also "that strict liability in tort and implied warranty in the absence of privity are merely different ways of describing the very same cause of action” (Mendel v Pittsburgh Plate Glass Co., 25 NY2d 340, 345).
Nevertheless, the idea that contractual principles inhere in breach of implied warranty claims for personal injuries has persisted, producing conceptual difficulties and anomalies when the courts tried to apply the cause of action in a tort setting {see, Prosser and Keeton, Torts § 97, at 692 [5th ed]). In Codling v Paglia (32 NY2d 330, supra), we were confronted with a claim in implied warranty seeking to impose liability against a manufacturer in favor of a nonuser bystander injured by a defective automobile. We had long since abandoned the privity requirement in many personal injury claims based on implied warranty and incrementally extended the duty of manufacturers and suppliers not only to purchasers and users, but to users’ family members (see, Greenberg v Lorenz, 9 NY2d 195), to remote purchasers (Randy Knitwear v American Cyanamid Co., 11 NY2d 5), to an airline passenger suing the manufacturer of a defective component part of an airplane (Goldberg v Kollsman Instrument Corp., 12 NY2d 432, supra), and to rescuers suing the manufacturer of a defective oxygen mask (Guarino v Mine Safety Appliance Co., 25 NY2d 460). In Codling we recognized the difficulties in adopting implied warranty principles in personal injury claims and, abandoning privity entirely, recognized a new cause of action under the broad principle of strict products liability, as other courts before us had done, to hold the manufacturer liable to the bystander.
This new cause of action was not separate from implied warranty but an amalgam which had been constructed by the *268 courts to establish a cause of action for liability without fault by merging warranty concepts (to avoid fault analysis) with negligence concepts (to avoid privity) (see, Victorson v Bock Laundry Mach. Co., 37 NY2d 395, 401, supra; Restatement [Third] of Torts: Products Liability [Tent Draft No. 2] § 1). The new cause of action recognized products liability as a discrete area of tort law, which borrows from both negligence and warranty, and attempts to avoid the confusion spawned by trying to categorize the various claims and remedies under prior law (id.). It imposes strict liability as a matter of social policy predicated on the idea that defendants ought "to pay for the costs attributable to damaging events caused by defects of a kind that made the product more dangerous than it would otherwise be”, concerns that had little to do with conventional contract principles (see, Prosser and Keeton, Torts § 98, at 692 [5th ed]). A difficulty has arisen, however, because in recognizing a cause of action for strict products liability, the courts have not had "a clear notion about the 'meaning of defect’ ”, especially in the context of defective design cases (id.).
In sum, although procedural distinctions may remain because mandated by the Legislature’s enactment of various provisions of the Uniform Commercial Code (see, Heller v U. S. Suzuki Motor Corp., 64 NY2d 407, 411), strict products liability and breach of implied warranty causes of action are substantively similar and impose liability without fault (see, Martin v Dierck Equip. Co., 43 NY2d 583, 589-590; Mendel v Pittsburgh Plate Glass Co., 25 NY2d 340, 345, supra; Ryion v Len-Co Lbr. Corp., 152 AD2d 978; Dickey v Lockport Prestress, 52 AD2d 1075, 1076). It makes little sense, therefore, to perpetuate a legal distinction between them based upon the method for determining defectiveness, particularly when the flaws in the consumer expectation standard for measuring defectiveness are recognized.
II
The majority has not attempted to define the consumer expectation standard, nor did the District Court use the phrase in its charge. Under one formulation, however, the standard provides that a product is defective, i.e., it is unreasonably dangerous, if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics” (see, Restatement [Second] of Torts § 402 A, comment i; see also, Kennedy, The Role of the *269 Consumer Expectation Test under Louisiana’s Products Liability Tort Doctrine, 69 Tul L Rev 117, 120 [1994]). The consumer expectation standard originated from the sales notion that a seller could agree, expressly or impliedly, to indemnify a buyer if the purchased product did not satisfy the buyer’s purposes. The obligation to "indemnify” applied only to the parties to the sale, those in privity, and did not "run with the goods” (see, 5 Harper, James and Gray, op. cit., § 28.16, at 454). As evolving social policy sought to hold manufacturers and sellers liable for personal injuries caused by defective products, however, the requirement of privity was narrowed and then eliminated, and the courts extended liability as far as social policy required (id., at 455-456). With these developments, it made little sense to think in terms of the buyer’s bargain or expectations. In many, if not most, cases the buyer was not litigating.
By contrast, the standard usually employed to determine design defectiveness in strict products liability claims requires a balancing of the risks attendant on using the product with the utility of the product when used as intended. As we stated in Robinson v Reed-Prentice Div. of Package Mach. Co. (49 NY2d 471, 479): "Where a product presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to detailed plans and specifications, it is said to be defectively designed. This rule, however, is tempered by the realization that some products, for example knives, must by their very nature be dangerous in order to be functional. Thus, a defectively designed product is one which, at the time it leaves the seller’s hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce” (see also, Voss v Black & Decker Mfg. Co., 59 NY2d 102, 107-108; Rainbow v Elia Bldg. Co., 79 AD2d 287, 291, affd 56 NY2d 550).
Although some jurisdictions have recognized the consumer expectation standard, or some variation of it, in tort litigation* New York has never done so and its utility for resolving claims of design defects has been widely criticized by commentators (see, Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 *270 Vand L Rev 593, 611-618 [1980]; Kennedy, The Role of the Consumer Expectation Test under Louisiana’s Products Liability Tort Doctrine, 69 Tul L Rev 117, 143-150; Fischer, Products Liability — The Meaning of Defect, 39 Mo L Rev 339, 348-350 [1974]; and see, authorities cited in 5 Harper, James and Gray, Torts § 28.32A, at 576). They contend that the test is ambiguous because it does not clearly refer to the expectations of the actual plaintiff or to those of ordinary consumers; in practice it has been applied inconsistently and, from a social policy standpoint, it produces bad results.
If the test is applied to determine the actual buyer’s expectations, as in contract law, it can result in imposing absolute liability upon manufacturers and sellers making them insurers of the product’s safety merely because the product did not live up to the consumer’s subjective expectations. If the test is used objectively, it is beyond the experience of most lay jurors to determine what an "ordinary consumer” expects or "how safe” a sophisticated modern product could or should be made to satisfy those expectations unless the jury is allowed to consider the cost or impracticality of alternative designs or, indeed whether any alternative design for the product was available.
The test can also produce bad results. For example, if the risk is one that is easily understood and appreciated by the average consumer, the manufacturer might not be liable even if the defect could be eliminated by available and inexpensive design changes. Conversely, if the defect was not apparent, liability might attach even if the product was in fact state of the art.
Moreover, the consumer expectation test is unworkable when applied in cases involving design defects. In claims involving manufacturing defects, a consumer may reasonably expect a product to be made in accordance with the manufacturer’s standards and expect to be compensated for injuries resulting from the manufacturer’s failure to meet them. The product is reasonably held defective because the manufacturer has not made the product as it intended. However, in design defect cases the plaintiff contends that the product has been made precisely as intended but is nevertheless defective because the design is defective. But unless some external standard, such as available alternative designs and risk/utility analysis is employed, how is the jury to measure the propriety of the design? The consumer cannot reasonably expect a design to be changed if the cost of doing so far outweighs the utility of the product or if there is no alternative design available. Some *271 products are inherently dangerous, knives was the illustration we used in the Robinson case (supra), and when that is so, policy concerns mandate that the responsibility for risks that cannot reasonably be designed out of a product should be transferred to the consumer, the party who has the choice of using them or not. (Restatement [Third] of Torts: Products Liability [Tent Draft No. 2] § 2, comment a, at 16.) The method for determining just what products fall within that group is the risk/utility analysis.
Because of these and other shortcomings, one commentator has stated that, when it comes to measuring defectiveness, the consumer expectation test applied without a risk/utility analysis is "a blunt instrument” (Kennedy, op. cit., at 150). Few courts have relied solely on it as a measure of defectiveness (see, Birnbaum, op. cit, at 615).
No New York court has recognized the consumer expectation standard to determine defectiveness in personal injury actions grounded on implied warranty — at least the parties and the majority have not cited any decision doing so — and I can see no persuasive policy reasons why we should do so now. If the test is unworkable when applied in tort causes of action grounded on strict products liability, it is equally unworkable when applied in tort causes of action grounded on breach of implied warranty. The correct standard in strict liability claims, according to the Third Restatement, should include a balancing of the risk of danger against the utility of the product as designed. In its words, "consumer expectations do not constitute an independent standard for judging the defectiveness of product designs” (Restatement [Third] of Torts: Products Liability [Tent Draft No. 2] § 2, comment f, at 29). They are "not determinative of defectiveness” because they do not take into account "whether the proposed alternative design could be implemented at reasonable cost, or whether an alternative design would provide greater overall safety”, i.e., the test does not take into consideration risk/utility factors (id.). Consumer expectations only value is when used as a factor in determining the reasonableness of alternative designs or how the product is portrayed and perceived by the public, i.e., whether the risk was foreseeable. As we stated in Robinson v Reed-Prentice Div. of Package Mach. Co. (supra) the conditions contemplated by "the ultimate consumer” must be taken into account, but the risk/utility analysis remains a necessary part of the equation for determining defectiveness in products liability cases (Restatement [Third] of Torts, op. cit; see also, Birnbaum, op. cit, at 617).
*272 Ill
The majority maintains, however, that the consumer expectation standard must be applied because breach of implied warranty is a statutory cause of action and the Court is not free to ignore the statute’s provisions or draw a distinction between its application to commercial claims and personal injury claims.
Implied warranties have been a part of our statutory law since at least 1911, long before any serious attempt was made to base tort liability on them {see, former Personal Property Law § 96, now UCC 2-314). Section 96, and its successor provisions in the Uniform Commercial Code, were enacted to address problems arising in commercial transactions. For many years they had no significant impact upon personal injury litigation because of the rules of privity. However, in 1975, shortly after Codling v Paglia (supra) was decided, section 2-318 of the Uniform Commercial Code was amended to harmonize it with existing case law by eliminating the requirement of privity in personal injury claims (see, 1975 NY Legis Ann, at 110; Heller v U. S. Suzuki Motor Corp., 64 NY2d 407, 411, supra). The amendment had no relevance to commercial claims; it was proposed by the Legislature, and widely supported, because it acknowledged and encouraged the judicial development of a separate category of warranty providing a tort remedy for personal injuries (see, 1975 NY Legis Ann, at 110; see also, Bill Jacket, L 1975, ch 774, Mem of State Consumer Protection Board, July 14, 1975; Mem of NY Law Rev Commn, Staff Notes Relating to A-3070; Mem of New York State Trial Lawyers Assn, May 12, 1975). The Legislature’s recognition of a distinction between the statutory cause of action for personal injury claims and commercial claims based on implied warranty is further manifested by the Legislature’s decision to adopt alternative B of the three formulations proposed by the National Conference of the Commissioners on Uniform State Laws, the alternative which removed the requirement of privity in personal injury claims based upon implied warranty, rather than alternative C which extends the rule (abolishing privity) to warranty claims other than those dealing with injuries to the person {see, 1A ULA 558 [Master ed], UCC 2-318, Official Comment 3).
Moreover, no words in the statute either before or after the amendment, provide that the defectiveness of the product in tort claims, or commercial claims for that matter, is to be measured by the consumer’s expectations. That standard has been *273 developed by the courts. It may accurately assess the terms and conditions of the bargain between the parties to a sale but it can hardly extend beyond them to address defectiveness in the sense that something is "wrong” with the product. The thing "wrong” with the product in the consumer expectation test is that it has not lived up to the consumer’s expectations and this is so even if the design of the product is perfection itself. The standard may retain some vitality when applied to commercial transactions but its individualized concept of injury is entirely foreign to tort doctrine underlying this area of law which is based upon the broad concept of enterprise responsibility to protect the public at large from harm.
Moreover, the statutory formulation of implied warranty has never restricted us in developing the tort remedy before. Long before the statute eliminated the requirement of privity for recovery, the courts narrowed and then eliminated it altogether. We did not feel inhibited by the statute in doing so: policy, not language, controlled the interpretation and application of the statute. Nor have the courts been constrained by the statute’s provisions when eliminating the UCC’s requirement of notice in tort actions (see, Fischer v Mead Johnson Labs., 41 AD2d 737; Kennedy v Woolworth Co., 205 App Div 648) or when shaping the law of disclaimers to apply them neutrally to personal injury cases (see, Velez v Craine & Clark Lbr. Corp., supra; see also, Walsh v Ford Motor Co., 59 Misc 2d 241; see also, 5 Harper, James and Gray, Torts § 28.25 [2d ed]).
The warranty claim in this case was for tortious personal injury and rests on the underlying "social concern [for] the protection of human life and property, not regularity in commercial exchange” (see, Restatement [Third] of Torts, op. cit., § 2, comment q, at 46). As such, it should be governed by tort rules, not contract rules. Nothing has prevented us in the past from construing and applying the provisions of the Uniform Commercial Code to supplement and advance the policy concerns underlying strict products liability generally, and we should not construe the statute now to establish a standard for determining defectiveness which is inconsistent with the present law in this area (see generally, UCC 1-103).
Accordingly, I dissent.
Chief Judge Kaye and Judges Bellacosa, Smith, Levine and Ciparick concur with Judge Titone; Judge Simons dissents in a separate opinion.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the *274 questions by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and. after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question No. 1 answered in the negative, certified question No. 2 answered in the negative, and certified question No. 3 answered in the affirmative.

 See, e.g., Barker v Lull Eng’g Co., 20 Cal 3d 413, 573 P2d 443; Caterpillar Tractor Co. v Beck, 593 P2d 871 (Alaska); and see generally, Saratoga Fishing Co. v Marco Seattle, 69 F3d 1432.